HON. NICOLÁS NOGUERAS, HIJO, demandante y apelado, *v.* Hon. RAFAEL HERNÁNDEZ COLÓN y OTROS, demandados y apelantes.

*Número:* AC-90-60 *Resuelto:* 4 de septiembre de 1990

408

*Jorge E. Pérez Díaz, Procurador General, y Juan R. Deliz Román, Procurador General Auxiliar,* abogados del Gobernador Rafael Hernández Colón; *Marcos A. Ramírez Lavandero,* de *Ramírez & Ramírez,* abogado de Miguel Hernández Agosto y José R. Jarabo, apelantes; *Nicolás Nogueras, Hijo, pro se.*

EL JUEZ ASOCIADO SEÑOR HERNÁNDEZ DENTON emitió la opinión del Tribunal.

Este recurso nos permite evaluar la constitucionalidad de la ley que crea una segunda sesión ordinaria para la Asamblea Legislativa de Puerto Rico, Ley Núm. 138 de 22 de julio de 1988 (2 L.P.R.A. sec. 1a *et seq*). El Gobernador y los Presidentes del Senado y de la Cámara de Representantes apelan la sentencia del Tribunal Superior, Sala de San Juan, que la declaró inconstitucional. Por los fundamentos que se exponen a continuación resolvemos que erró el tribunal de instancia y revocamos su dictamen.

## I

El 22 de julio de 1988 se aprobó la Ley Núm. 138, *supra,* "a los fines de proveer para una segunda sesión ordinaria anual para la Asamblea Legislativa". Esta ley enmendó las Secs. 1, 2, 4 y 5 de la Ley Núm. 9 de 9 de abril de 1954 (2 L.P.R.A. secs. 1a, 202, 204 y 205), que disponía que las sesiones ordinarias de la Asamblea Legislativa comenzarían el segundo lunes de enero de cada año y terminarían a más tardar el 30 de abril del mismo año.

En lo que nos concierne, la Ley Núm. 138, *supra*, prescribe:

Las sesiones ordinarias anuales de la Asamblea Legislativa comenzarán, la primera, el segundo lunes de enero de cada año y terminará a más tardar el 31 de mayo del mismo año. *La segunda [sesión] comenzará el segundo lunes de septiembre y terminará a más tardar el 31 de octubre del mismo año.* Disponiéndose, que en los años que corresponda celebrar elecciones generales, no se reunirá la Asamblea Legislativa para celebrar la segunda sesión. (Énfasis suplido.)

A tenor con esta disposición se celebró la sesión inaugural de la segunda sesión ordinaria el lunes 11 de septiembre de 1989. En esa ocasión, el demandante, Senador Nicolás Nogueras, Hijo, sometió una moción en el Senado para que se levantaran los trabajos indefinidamente por entender que la segunda sesión era inconstitucional. Esta petición fue considerada y rechazada por el Senado.

Al día siguiente, el Senador Nogueras presentó una demanda de sentencia declaratoria ante el Tribunal Superior, Sala de San Juan, en la que solicitaba que se declarara inconstitucional la mencionada Ley Núm. 138. De la minuta de la vista celebrada el 10 de octubre de 1989 se desprende que las partes acordaron que la única controversia a someterse para resolución del tribunal era la constitucionalidad de la ley. Después de estudiar los argumentos de derecho expuestos por las partes, el Tribunal Superior resolvió que la ley era inconstitucional por violar la Sec. 10 del Art. III de la Constitución del Estado Libre Asociado, L.P.R.A., Tomo 1.

Ante nos, el Gobernador y los presidentes de los dos (2) cuerpos legislativos sostienen que la Ley Núm. 138, *supra*, es compatible con el ordenamiento constitucional y que constituye un instrumento indispensable para el funcionamiento adecuado de la Rama Legislativa en el Estado moderno. Sus planteamientos requieren que interpretemos la Sec. 10 del Art. III de la Constitución del Estado Libre Asociado, *supra*.

## II

■ Al emprender esta tarea partimos de la premisa de que nuestra Constitución formula "un conjunto de normas fundamentales que establece las bases jurídicas de la ordenación político-social de un pueblo, protegiendo los derechos y la dignidad esencial de la posición de los ciudadanos, estableciendo las instituciones de gobierno y encauzando los procesos políticos". *La nueva Constitución de Puerto Rico*, Río Piedras, Ed. U.P.R., Escuela de Administración Pública, 1954, pág. 122.

La Constitución en el Estado moderno es un documento de gran dinamismo que establece un ordenamiento político para las generaciones del presente y del futuro. Su vitalidad y perdurabilidad dependerán de su capacidad para definir los valores fundamentales de un pueblo a través de todos los tiempos:

Es un documento que rebasa las preferencias personales de sus autores y plasma las esperanzas de ulteriores generaciones. Su

factura es moderna, de lenguaje claro y sencillo, susceptible a una continua renovación. No está escrito en lengua extinta, arduo de descifrar y referente a asuntos esotéricos. Interpretamos una Constitución, no los Rollos del Mar Muerto. *P.R. Tel. Co. v. Martínez*, 114 D.P.R. 328, 350 (1983).

Al interpretar los contornos de la Constitución del Estado Libre Asociado debemos garantizar su vigorosidad y relevancia a los problemas socio-económicos y políticos de nuestro tiempo. *López Vives v. Policía de P.R.*, 118 D.P.R. 219, 227 (1987). Recientemente reafirmamos este principio en *P.I.P. v. C.E.E.*, 120 D.P.R. 580, 613 (1988), al expresar que:

La permanencia y estabilidad de nuestra Constitución depende, en última instancia, de su capacidad para responder a los distintos problemas sociales, económicos y políticos a que se enfrenta el país. *Como intérpretes máximos de este documento no podemos limitar su alcance ni congelar sus principios a la época en que se promulgaron.*

. . . . . . . .

*Hay que evitar pronunciamientos que la fosilicen y la conviertan en pieza de museo de historia.* (Énfasis suplido.)

También debemos evitar que interpretaciones inflexibles y el apego a viejos modelos impidan su aplicabilidad a las eventualidades del futuro y en pocos años tornen obsoleta una constitución diseñada para guiar la vida de un pueblo por varios siglos. De este modo no limitamos el espacio vital que necesitan las instituciones creadas en virtud de ésta para cumplir con sus respectivas responsabilidades constitucionales. Tampoco debemos olvidar que "'el sentido de hoy no es siempre el sentido de mañana' [y que l]a interpretación judicial tiene por su naturaleza una evolución natural para las distintas épocas". *Pacheco v. Vargas, Alcaide*, 120 D.P.R. 404, 410 (1988), y casos allí citados.

Al analizar la controversia de autos reconocemos que el lenguaje escrito de una Constitución, en particular el de los estatutos, es por su propia naturaleza casi siempre susceptible a diversas interpretaciones. Véanse: Murphy, Fleming y Harris, *American Constitutional Interpretation*, Nueva York, Ed.

Foundation Press, 1986, págs. 126–131; L.H. Tribe, *Constitutional Choices*, Massachusetts, Harvard U. Press, 1985, págs. 7–12; R. Dickerson, *The Interpretation and Application of Statutes*, Boston, Little, Brown and Co., 1975, págs. 43–53; F. Frankfurter, *Some Reflections on the Reading of Statutes*, 47 Colum. L. Rev. 527 (1947). Sin embargo, hay que tener presente que las disposiciones de una Constitución tienen que interpretarse de manera distinta a la que se aplica a los estatutos. A diferencia de las leyes, nuestra Constitución está redactada en términos amplios que establece principios generales y no reglas específicas. Ello obedece a que, como apuntó el Juez Cardozo, "[u]na Constitución no establece, ni debe establecer normas para la hora que pasa, sino principios para un futuro que se expande". B.N. Cardozo, *La naturaleza de la función judicial*, Buenos Aires, Ed. Arayú, 1955, pág. 64.

▪ Al descargar nuestra responsabilidad tenemos el deber de hacer que el derecho sirva propósitos útiles y de evitar que una interpretación literal y restrictiva de la Constitución lleve a resultados absurdos o contrarios a los valores fundamentales consagrados en este documento.

▪ Por último, reafirmamos el postulado fundamental de hermenéutica constitucional que establece que al examinar un estatuto, "el Poder Judicial —en abono de una deferencia hacia el Poder Legislativo— debe esforzarse por lograr interpretaciones congruentes y compatibles con el mantenimiento de la constitucionalidad de una ley". *Banco Popular v. Mun. de Mayagüez,* 126 D.P.R. 653 (1990). Véanse, además: *P.R.P. v. E.L.A.*, 115 D.P.R. 631, 642 (1984); *Milán Rodríguez v. Muñoz*, 110 D.P.R. 610, 618 (1981); *Pueblo ex rel. M.G.G.*, 99 D.P.R. 925, 927 (1971). Es principio firmemente establecido en nuestro ordenamiento que "[u]n estatuto es y se presume constitucional hasta que resolvamos lo contrario". *Cerame-Vivas v. Srio. de Salud*, 99 D.P.R. 45, 51 (1970); *Esso Standard Oil v. A.P.P.R.*, 95 D.P.R. 772, 783 (1968).

Al resolver la controversia de este caso, nos corresponde la función de ser los intérpretes finales de la Constitución. Reconociendo la trascendencia de esta responsabilidad, los otros poderes del Gobierno comparecen ante esta Curia y mediante excelentes escritos solicitan que revoquemos la sentencia apelada y nos pronunciemos sobre la validez de la Ley Núm. 138, *supra*, aprobada por la Asamblea Legislativa al amparo de la Sec. 10 del Art. III de la Constitución del Estado Libre Asociado, *supra*, y firmada por el Gobernador.

## III

La Sec. 10 del Art. III de la Constitución del Estado Libre Asociado, *supra*, ed. 1982, pág. 341, dispone:

La Asamblea Legislativa será un cuerpo con carácter continuo durante el término de su mandato y se reunirá en sesión ordinaria cada año a partir del segundo lunes de enero. La duración de las sesiones ordinarias y los plazos para la radicación y consideración de proyectos serán prescritos por ley. Cuando el Gobernador convoque a la Asamblea Legislativa a sesión extraordinaria sólo podrá considerarse en ella los asuntos especificados en la convocatoria o en mensaje especial que el Gobernador le envíe en el curso de la sesión, la cual no podrá extenderse por más de veinte días naturales.

El decreto de inconstitucionalidad del foro de instancia se fundó en las conclusiones siguientes: Primero, que la Sec. 10 del Art. III de nuestra Constitución, *supra*, establece de manera taxativa el número de sesiones ordinarias anuales que la Asamblea Legislativa puede celebrar, ya que la frase "se reunirá en sesión ordinaria cada año" limitaba el número de sesiones ordinarias anuales a uno. Segundo, que al aprobarse nuestra Constitución en 1952 no se facultó expresamente a la Asamblea Legislativa para legislar mediante la creación de más de una sesión ordinaria. Tercero, que la facultad de la Asamblea Legislativa para crear una segunda sesión ordinaria anual tampoco surge del concepto "cuerpo de carácter continuo" expresado en la citada

Sec. 10, ya que éste se refiere únicamente a la radicación de proyectos y al funcionamiento de comisiones.

 A diferencia de la Constitución de Estados Unidos de Norteamérica, nuestra Constitución delega *todo* el poder legislativo en la Asamblea Legislativa, sujeto éste a las limitaciones contenidas en la Carta de Derechos. Véase R. Serrano Geyls, *Derecho Constitucional de Estados Unidos y Puerto Rico*, San Juan, Ed. C. Abo. P.R., 1986, Vol I, págs. 206–209 y 337–338. La Asamblea Legislativa de Puerto Rico, a diferencia de lo que sucede con el Congreso de Estados Unidos, no es una legislatura de poderes enumerados. "Este diseño constitucional en Estados Unidos es el resultado de la realidad histórica que dio base a la creación de una nación donde el poder político se distribuye en forma federada. El pueblo norteamericano le confiere parte de dicho poder al Congreso y a las otras Ramas del Gobierno, y parte a los estados. Esta estructura de poder compartido explica la enumeración de poderes. . . . Es obvio que en Puerto Rico no existe, ni ha existido un diseño federado de gobierno. Se entiende que la Asamblea Legislativa, distinto al Congreso, puede legislar sobre cualquier asunto que afecte el bienestar de los puertorriqueños." *P.I.P. v. C.E.E.*, supra, págs. 620–621. Véanse, además: L.H. Tribe, *American Constitutional Law*, 2da ed., Nueva York, Ed. Foundation Press, 1988, págs. 298–300; 2 *Treatise on Constitutional Law: Substance and Procedure* Sec. 23.38, pág. 521 (1986).

 Esta distinción surge del propio texto constitucional que en la Sec. 1 del Art. III de nuestra Constitución, *supra*, pág. 334, provee: "El Poder Legislativo se ejercerá por una Asamblea Legislativa . . . ." Por otro lado, su contraparte en la Constitución federal, la Sec. 1, Art. I, dispone: "Todos los poderes legislativos *otorgados por esta Constitución* residirán en un Congreso de los Estados Unidos . . . ." (Énfasis suplido.) Const.

EE.UU., L.P.R.A., Tomo 1, ed. 1982, pág. 169.[1] Al amparo de nuestro esquema gubernamental, la Asamblea Legislativa de Puerto Rico tiene la facultad de legislar sobre todo aquello que no esté expresa o implícitamente prohibido por el propio texto de la Constitución. Véase, también, Tribe, *American Constitutional Law, op. cit.*, págs. 297–298.[2]

En estas circunstancias resolvemos que erró el tribunal de instancia al concluir que la Ley Núm. 138, *supra*, era inconstitucional debido a que la Asamblea Legislativa no estaba facultada expresamente para legislar a esos efectos. Considerada la concesión amplia y general del poder legislativo que le hace nuestra Constitución a la Asamblea Legislativa de Puerto Rico, una autorización expresa no era necesaria.

## IV

Para comprender el alcance de los poderes concedidos por nuestra Constitución a la Rama Legislativa es preciso examinar la experiencia histórica anterior a la aprobación de la Constitución.

La característica fundamental del Poder Legislativo antes de 1952 era su subordinación al Poder Ejecutivo que, a su vez, era controlado por el Presidente de Estados Unidos. Véanse: J. Trías Monge, *Historia Constitucional de Puerto Rico*, Río Piedras, Ed. U.P.R., 1982, Vol. III, págs. 152–155; J. Trías Monge, *Legislative and Judicial Reorganization in Puerto Rico*, Tesis inédita, 1947–48, págs. 160–161. Una de las formas más efectivas de debilitar el Poder Legislativo fue limitar la duración de las sesiones a periodos de tiempo cortos y dejar en manos del ejecutivo todo lo relativo a la convocatoria de sesiones extraordinarias.

---

[1] Estos poderes están enumerados específicamente en la Sec. 8 del Art. I de la Constitución federal, L.P.R.A., Tomo 1. El Congreso también tiene facultad para legislar en casos que sea necesario y conveniente para poner en vigor los poderes delegados.

[2] Su única limitación es aquella que surge de la Cláusula de Supremacía (Art. VI) de la Constitución federal. La Legislatura de Puerto Rico puede legislar en todas las áreas en las que el Congreso federal no haya ocupado el campo.

La primera Ley Orgánica, el Acta Foraker de 1900, 31 Stat. 77, Documentos Históricos, Sec. 29, L.P.R.A., Tomo 1, disponía que la Cámara de Delegados se reuniría en la fecha que determinase el Consejo Ejecutivo. Ésta no podía continuar en sesión por más de sesenta (60) días a menos que el Gobernador la convocara a sesión extraordinaria.

La segunda Ley Orgánica, el Acta Jones de 1917, 39 Stat. 960, Documentos Históricos, Sec. 33, L.P.R.A., Tomo 1, disponía que la Asamblea Legislativa se reuniría cada dos (2) años el segundo lunes de febrero del año correspondiente. En 1927 el Congreso enmendó el Acta Jones para permitir las sesiones anuales, pero la duración de éstas fue restringida a comenzar el segundo lunes de febrero y a finalizar el 15 de abril de cada año.

Conscientes de esta experiencia histórica y de la conveniencia de crear un Gobierno con tres (3) poderes en paridad de jerarquía, la Convención Constituyente fortaleció el poder legislativo y estableció el principio de la continuidad del proceso legislativo al formular y aprobar la Sec. 10 del Art. III de la Constitución, *supra*. Esta medida constituyó "[u]na de las reformas potencialmente más importantes efectuadas por la Constitución". Trías Monge, *Historia Constitucional de Puerto Rico, op. cit.*, pág. 152. Véase, también, *La nueva Constitución de Puerto Rico, op. cit.*, págs. 364, 365 y 384–393.

Por otro lado, un examen del Diario de Sesiones de la Convención Constituyente revela que en ésta no se consideró ni se discutió específicamente el número de sesiones ordinarias y que se dejó a discreción de la Asamblea Legislativa todo lo referente al número de días en que se reuniría.[3]

En el debate que se suscitó entre los miembros de la Convención, el delegado Ramiro Colón propuso una enmienda para establecer un número mínimo de días durante los cuales la Legislatura tendría que estar reunida. Esta enmienda fue derrotada ya que los constituyentes entendían que debía ser la propia

---

[3] Nótese que la Sec. 10 del Art. III de la Constitución del Estado Libre Asociado, L.P.R.A., Tomo 1, ed. 1982, pág. 341, dispone que "[l]a duración de la sesiones ordinarias y los plazos para la radicación y consideración de proyectos serán prescritos por ley".

Legislatura la que, según las exigencias del momento histórico, decidiera cuánto tiempo estaría reunida. Por su pertinencia a la controversia de autos, reproducimos íntegramente este debate:

Sr. RAMIRO COLON: Señor Presidente.

Sr. PRESIDENTE: Señor Delegado.

Sr. COLON: Una enmienda al artículo nueve. En la línea 20, página tres, después de "ley", "Los términos de las sesiones ordinarias no se establecerán por menos de 90 días".

Sr. PRESIDENTE: ¿A dónde va la enmienda?

Sr. COLON: Después de la palabra "ley", en la línea 20.

Sr. PRESIDENTE: Línea 20, página tres, Su Señoría.

Sr. COLON: Página tres. De acuerdo como está, señor Presidente, está redactado, los términos de las sesiones ordinarias serán prescritos por ley, y mi enmienda es para que nunca sean menores de noventa días.

Sr. PRESIDENTE: ¿Menores o mayores?

Sr. COLON: Menores de noventa días.

Sr. PRESIDENTE: Menores.

Sr. REYES DELGADO: Una pregunta; ¿por qué no decimos de una vez que será la sesión ordinaria por noventa días?

Sr. COLON: Porque si la [Asamblea] Legislativa quiere pasar una ley para que estén en sesión ordinaria más de noventa (90) días, pues tiene derecho la [Asamblea] Legislativa, lo que no puede hacerse es ponerle un día de sesión ordinaria, si se aprueba mi enmienda.

Sr. GAZTAMBIDE ARRILLAGA: Nosotros objetamos la enmienda y entendemos que si la legislatura terminara antes los trabajos no hay razón para mantenerla abierta noventa días.

Sr. COLON: La enmienda no ha sido aparentemente secundada. Estoy esperando que la secunden para pedir un turno.

Sr. PRESIDENTE: Ha sido secundada. Su Señoría tiene el primer turno adicional.

Sr. COLON: Adicional no.

Sr. PRESIDENTE: Adicional a los . . . minutos que ya consumió, pero la Presidencia no va a tomarlos en cuenta.

Sr. COLON: Sr. Presidente, me quedan, entonces como tres o cuatro minutos. Me parece señor Presidente que es necesario que dentro del poder que se le da a la [Asamblea] Legislativa para aprobar una ley estableciendo los términos de sesiones ordinarias, es necesario que en la constitución se haga constar una limitación, un mínimum de los días que puede envolver una sesión ordinaria,

porque podría darse el caso de que si por alguna razón no se quisiera reunir la Asamblea Legislativa, con pasar un proyecto de ley y aprobar una ley diciendo que los términos serán de un día, y *se podría poner varios términos al año o un solo término*, tendríamos dentro de ley una huelga legislativa. Me parece a mí que si la experiencia nos indica que en el pasado noventa (90) días han sido muy pocos días para una sesión extraordinaria, esa base debía ser el mínimum que se establezca en la constitución para evitar un error de una legislatura posterior. Ese es el objetivo de mi enmienda. Eso no quiere decir que la [Asamblea] Legislativa si cree que noventa (90) días es muy poco le ponga más de (90) días, pero nunca [menos] de noventa (90) días.

Sr. GAZTAMBIDE ARRILLAGA: Yo quiero aclarar que el término de las sesiones legislativas en la actualidad no es de noventa días, es de sesenta días. Y que la mayor parte se termina, o bien en la fecha, o cuatro o cinco días después. No debe haber ninguna razón para que un trabajo que se puede hacer en 60 ó en 65 días, obligue a la Asamblea Legislativa a estar reunida hasta noventa (90) días. De manera que si los trabajos terminaren antes de noventa días se puede recesar.

Pero es que a lo mejor sólo hacen falta cinco días; ¿para qué le vamos a dar noventa días? Si hicieran falta los noventa así se dispondrá. Pero no obligar[los] a estar noventa días reunidos cuando a lo mejor no hace falta para nada.

Sr. RAMIRO COLON: Propongo una enmienda a los sesenta.

Sr. GAZTAMBIDE ARRILLAGA: *Es que yo creo que es malo establecerle poderes, digo limitaciones al poder legislativo. Dentro de la tradición y la magnífica cultura de este pueblo el poder legislativo pondrá el término que crea conveniente, pero no lo debemos limitar, en forma alguna constitucionalmente.*

VARIOS DELEGADOS: Que se vote.

Sr. PRESIDENTE: Los que estén por la afirmativa respecto a la enmienda dirán que sí. En contra, no. Derrotada la enmienda. (Énfasis suplido.) 2 Diario de Sesiones de la Convención Constituyente 840–841 (1952).

De este debate surge claramente que ninguno de los delegados estaba preocupado por que la Asamblea Legislativa aumentara la duración o el número de las sesiones ordinarias. La única preocupación que se desprende del intercambio entre los delegados es que los legisladores decidieran no reunirse. Para asegu-

rarse de que esto no sucediera, los delegados incluyeron en la Sec. 10 del Art. III de nuestra Constitución, *supra*, la frase "se reunirá en sesión ordinaria cada año a partir del segundo lunes de enero", que en este contexto quiere decir que la Asamblea Legislativa no tiene discreción para dejar de reunirse por lo menos una vez cada año en sesión ordinaria.

Sin embargo, todos estaban de acuerdo en que si la Legislatura necesitaba más tiempo para desempeñar sus funciones, ésta tenía la facultad de extender las sesiones mediante legislación a esos efectos. El informe de la Comisión de la Rama Legislativa de la Convención Constituyente lo demuestra. Al referirse a lo que hoy es la Sec. 10 del Art. III de la Constitución, *supra*, la Comisión expuso en su informe:

> El artículo 9 elimina uno de los defectos principales del procedimiento legislativo dispuesto por la vigente Carta Orgánica, los límites de duración de las *sesiones legislativas.* Las más connotadas [sic] autoridades sobre la materia están contestes en que tales límites constituyen uno de los obstáculos mayores con que puede confrontarse una legislatura y que generalmente producen debates y proyectos inadecuados.
>
> . . . . . . . .
>
> Esa realidad ha tenido plena confirmación en Puerto Rico. En todas las épocas los últimos días de la sesión legislativa anual se han caracterizado por la prisa y la confusión en los procedimientos. Ha sido necesario multiplicar el número de sesiones especiales, porque la Asamblea Legislativa no tiene suficiente tiempo durante las sesiones regulares para la adecuada consideración de las cuestiones públicas.
>
> *La Comisión recomienda, por lo tanto, la eliminación de los límites constitucionales sobre la duración de las sesiones y que se permita a la legislación ordinaria, de acuerdo con las condiciones dominantes, fijar tales límites. Hacemos igual recomendación sobre el término para la radicación y consideración de proyectos.* (Énfasis suplido y escolio omitido.) Diario de Sesiones, *supra*, Vol. 4, pág. 2582.

De lo anterior se desprende que la intención de los delegados fue eliminar los límites constitucionales sobre la duración de las sesiones. Aunque se fijó la fecha de inicio de la sesión ordinaria

anual, en ningún momento se consideró esto como una restricción al número de sesiones ordinarias que podían celebrarse anualmente.

Preocupados por la experiencia durante las Actas Foraker y Jones, los delegados prefirieron dejar en manos de la Asamblea Legislativa lo referente a la duración de las sesiones y no establecieron restricción alguna sobre el número de las sesiones ordinarias que podían celebrarse cada año. Tampoco limitaron el número de sesiones extraordinarias que podían ser citadas anualmente por el Gobernador mediante convocatoria o mensaje especial, aunque sí la duración de cada una a veinte (20) días naturales. De hecho, aunque la Sec. 10 del Art. III utiliza el término "sesión extraordinaria" en singular, solamente bajo una interpretación restrictiva y literal de la misma podría considerarse dicho término como una limitación al número de estas sesiones que el Gobernador podía convocar anualmente. La tradición y la historia han demostrado que ésta nunca ha sido la interpretación.

De igual modo, al utilizar el término "sesión ordinaria" en singular, los forjadores de la Constitución tampoco pretendieron limitar la facultad de fijar la duración y el número de sesiones ordinarias que la Asamblea Legislativa podía celebrar anualmente. Correspondía a la Asamblea Legislativa, mediante legislación, fijar estos términos a la luz de las circunstancias prevalecientes y *sin menoscabar el delicado equilibrio de poderes del ordenamiento constitucional.*

Por otro lado, los límites fijados en la Constitución a la extensión del término de cada sesión extraordinaria demuestran que cuando los delegados de la Convención Constituyente quisieron imponer una restricción a la autoridad delegada, la formularon en el propio texto de la Constitución.

Al amparo de la Sec. 10 del Art. III de nuestra Constitución, *supra*, la Asamblea Legislativa aprobó la Ley Núm. 9, *supra*, y fijó unos límites a la duración de la sesión ordinaria. Esta ley dispuso que las sesiones ordinarias de la Asamblea Legislativa comenzarían el segundo lunes de enero de cada año y terminarían

a más tardar el 30 de abril del mismo año. Aunque se estableció el principio de la continuidad en el proceso legislativo y se concedió a la Asamblea Legislativa la autoridad para fijar los términos de las sesiones, ésta decidió establecer un término inicial limitado para desempeñar las funciones previstas en ese momento histórico.

Sin embargo, después de una experiencia de más de tres (3) décadas, en la cual la Asamblea Legislativa gradualmente se fortaleció y amplió su esfera de acción frente a los otros poderes gubernamentales, se decidió cambiar los límites fijados en 1954. Examinemos, pues, los factores que llevaron a la Asamblea Legislativa a enmendar esta ley y crear la segunda sesión ordinaria.

## V

El Historial Legislativo y la Exposición de Motivos de la Ley Núm. 138, *supra*, revelan que los legisladores decidieron crear una segunda sesión ordinaria para atender eficazmente las exigencias del proceso legislativo moderno. Para avalar esta decisión, en la Exposición de Motivos de la Ley Núm. 138, *supra*, se cita de la obra *La nueva Constitución de Puerto Rico, op. cit.*, específicamente de la pág. 387:

El trabajo de una legislatura es enorme. Tiene que organizarse, nombrar comisiones, celebrar audiencias y sesiones de las comisiones, dar lectura a los proyectos y a las medidas aprobadas, preparar informes sobre cientos y miles de proposiciones, organizar conferencias, si hay dos Cámaras cuyos puntos de vista deben conciliarse; y tiene, por último, que acostumbrar a una gran proporción de sus nuevos miembros a la rutina del procedimiento y al clima especial de la vida parlamentaria. *No pueden realizarse estas funciones en un corto período de tiempo sin graves daños para la eficacia legislativa.* Es indudable que una mayor libertad de la legislatura en este respecto ayudaría a corregir algunas de las deficiencias de la presente maquinaria legislativa de Puerto Rico.

Además, la Asamblea Legislativa concluyó:

El modelo de las sesiones ordinarias de corta duración sigue el patrón de la Ley Foraker y la Ley Jones inspirado en evitar la

llamada "legislación excesiva". Hoy, dicha justificación está descartada por anticuada y por carecer de vigencia ante las nuevas realidades y necesidades del pueblo. Tampoco ha logrado disminuir el número de medidas presentadas y aprobadas.

El volumen de legislación aprobada dependerá, en última instancia, de las necesidades públicas y la oportunidad de planear efectivamente el trabajo legislativo, especialmente en las asignaciones presupuestarias. *Los períodos de reuniones más extensos de la Asamblea Legislativa permitirán un mejor cumplimiento de dicho principio y la oportunidad de mantenerse al día en las necesidades de los ciudadanos.*

El moderno Puerto Rico es distinto a la visión de las leyes Foraker y Jones. La Asamblea Legislativa tiene que considerar un Presupuesto General del Gobierno y el Programa de Mejoras Permanentes que sobrepasan la cifra de cuatro mil millones de dólares para unas cien (100) agencias e instrumentalidades públicas, y otra voluminosa legislación para atender el funcionamiento de la Rama Ejecutiva, la Rama Judicial y el Gobierno Municipal. *Ello y el ponderado análisis de la obra de gobierno amerita una extensión de la actual duración de noventa (90) días en las sesiones ordinarias.* (Énfasis suplido.) *La nueva Constitución de Puerto Rico, op. cit.,* pág. 387.

Por su parte, el Representante Santiago García recogió el sentir unánime de la Cámara de Representantes sobre los propósitos de la Ley Núm. 138, *supra:*

Desde el 1954, en que se legisló la Ley 9 de 19 de abril de ese año, hasta este momento en que consideramos enmendar la misma, han transcurrido . . . treinta y cinco años. Durante esos treinta y cinco años las sesiones legislativas han sido extendidas mediante resoluciones conjuntas en veintiséis ocasiones . . . Durante ese tiempo . . . se han convocado alrededor de setenta y cuatro sesiones extraordinarias. El presupuesto que regía para el 1954 . . . ascendía a la suma de ciento sesenta y nueve millones novecientos ochenta y un mil quinientos cuarenta dólares. Comparado con el presupuesto consolidado . . . para el año 1988–89, que suma . . . diez mil doscientos diecisiete punto ocho millones de dólares . . . . El crecimiento del Gobierno ha sido patente. Hay muchas más agencias mucho más especializadas y muchos más asuntos que atender a los que había en el 1954 . . . . Como el tiempo . . . es tan limitado, apenas tenemos tiempo para atender las iniciativas legis-

lativas, muchas de ellas muy importantes y muy buenas para dar atención, casi de forma ritualista, a la legislación que somete el Ejecutivo y en esa consideración de la legislación que somete el Ejecutivo, se nos va el tiempo hábil que dispone la Asamblea Legislativa para su sesión ordinaria y hay que extenderla y extenderla y extenderla y convocar y convocar a sesiones ordinarias. No podemos responsabilizar a nadie por esa limitación en la duración de la sesión ordinaria que no sea la propia Asamblea Legislativa porque la Constitución dejó en manos de la Asamblea Legislativa el determinar la duración de sus sesiones y en vez de ampliarla, de hacerla realmente contínua o extenderla, nos achicamos las manos al extremo de que con el aumento en el trabajo legislativo en el transcurso del tiempo nos hemos visto con las limitaciones que anteriormente hemos señalado. Diario de Sesiones de 21 de abril de 1988, págs. 80–81.

La creación de una segunda sesión ordinaria para la Asamblea Legislativa es compatible con el concepto "cuerpo de carácter continuo". A diferencia de las otras ramas del Gobierno, el Poder Legislativo trabaja en sesiones. Es durante estas sesiones que la Asamblea Legislativa cumple con su principal función constitucional: la de aprobar leyes. Sin embargo, en sociedades complejas y democráticas, donde el Estado ejerce múltiples funciones económicas y sociales, el proceso legislativo requiere más tiempo para conciliar los distintos grupos e intereses en conflicto y formular leyes que reflejen el consenso político sobre la dirección del país. De esta manera se garantiza la legitimidad y efectividad de las decisiones.

Por otro lado, esta no es su única función. La Legislatura tiene, además, la responsabilidad de "fiscalizar el gobierno, debatir asuntos de interés general e informar al país sobre la marcha de la cosa pública . . . . Las funciones de investigación, fiscalización, discusión y divulgación no están subordinadas a la de legislación". *Romero Barceló v. Hernández Agosto*, 115 D.P.R. 368, 375 (1984).

En vista de las complejidades sociales, económicas y políticas del país, y considerando el tipo de gobierno que prevalece

en Puerto Rico con sus múltiples funciones, agencias y entidades gubernamentales, la Asamblea Legislativa no puede desempeñar a cabalidad la totalidad de sus responsabilidades dentro de un esquema estrecho de sesiones de corta duración.

 La frase "cuerpo de carácter continuo durante el término de su mandato" significa que cada Asamblea Legislativa queda constituida desde que los Senadores y Representantes son electos hasta las próximas elecciones generales, es decir, cada cuatro (4) años. 16 L.P.R.A. sec. 3. La función de aprobación de las leyes se lleva a cabo durante las sesiones ordinarias y en algunas circunstancias particulares durante las sesiones extraordinarias. (4)

 Sin embargo, las demás funciones se pueden llevar a cabo aun cuando la Asamblea Legislativa no se encuentre reunida. Por esta razón, en *Hernández Agosto v. Ortiz Montes*, 115 D.P.R. 564, 568 (1984), y en *Dapena Thompson v. Colberg Ramírez*, 115 D.P.R. 650, 653 (1984), reconocimos la facultad de las comisiones legislativas para seguir ejerciendo sus funciones después de haber expirado el término de las sesiones ordinarias.

 A pesar de lo anterior y a diferencia del Poder Ejecutivo y, el Poder Judicial, la Asamblea Legislativa constituida en una sesión ordinaria, no ejercía labores durante todo el año. La Ley Núm. 138, *supra*, remedia esa situación al proveer para que la Legislatura constituida en sesiones pueda funcionar durante todo el año, concediendo más tiempo para el desempeño de la función legislativa. En esencia, la citada Ley Núm. 138 tiene el efecto de contribuir a equiparar las condiciones de trabajo del Poder Legislativo para fortalecer, de esta manera, el equilibrio dinámico dispuesto en nuestro ordenamiento constitucional.

_____

(4) Como regla general, la Asamblea Legislativa sólo puede reunirse en sesión extraordinaria cuando la convoque el Gobernador. Pueden reunirse sin necesidad de convocatoria únicamente para celebrar juicios de residencia o para ratificar o rechazar una proclama de ley marcial. Véanse: Art. III, Sec. 21 y Art. IV, Sec. 4, Const. E.L.A., L.P.R.A., Tomo 1.

La teoría que se adoptó cuando se aprobó la Constitución del Estado Libre Asociado era que la Asamblea Legislativa adquiriera un orden en igualdad de jerarquía a las demás ramas del Gobierno. Así, si el proceso de ejecutar (Poder Ejecutivo) e interpretar las leyes (Poder Judicial) era de carácter completo y continuo, de igual forma la acción legislativa también tendría que serlo. Establecer lo contrario sería ubicar en un plano inferior el trabajo de la Asamblea Legislativa con respecto a las demás ramas y debilitar el esquema de separación de poderes en que se funda nuestra Constitución.

■ El tribunal de instancia reconoce que no es inherentemente inconstitucional el que la Asamblea Legislativa extienda por un mes y medio una sesión ordinaria; se puede, en términos prácticos, llegar al mismo resultado haciendo una sesión larga con un receso intermedio.(5) La diferencia realmente es semántica y no sustantiva. Independientemente del método utilizado, su propósito es el mismo: ampliar el número de días en que la Asamblea Legislativa se reúne. La Constitución no excluye ninguna de estas alternativas.

■ *En ausencia de una prohibición constitucional para la celebración de una segunda sesión ordinaria, la Asamblea Legislativa tiene el poder de crear una segunda sesión ordinaria para atender los asuntos ante su consideración.* Bajo estas circunstancias procede, entonces, que examinemos si esta legislación afecta de manera impermisible los atributos y funciones del Poder Ejecutivo o si es incompatible con la doctrina de separación de poderes.

---

(5) En la conclusión núm. 6 de la sentencia recurrida, el tribunal de instancia dispuso: "6. Si realmente la Asamblea Legislativa quiere aplicar el principio de continuidad a la celebración de las sesiones ordinarias anuales lo puede hacer enmendando la ley 9 del 9 de abril de 1954 para crear una sesión ordinaria relativamente larga, pero con un receso intermedio; es decir, fraccionar la sesión ordinaria en dos períodos. Dicho en otros términos, se pueden lograr los mismos objetivos de la actual segunda sesión fraccionando mediante legislación la duración de las sesiones ordinarias anuales." Sentencia Declaratoria de 19 de diciembre de 1989, pág. 32.

## VI

Al distribuir los poderes entre tres (3) ramas iguales e independientes, la Constitución evitó la concentración de poderes en una de ellas y garantizó la libertad individual y colectiva de los ciudadanos. Nuestra Constitución también contiene el complejo sistema de pesos y contrapesos que asegura una interacción entre los tres (3) componentes del sistema de gobierno y genera un equilibrio dinámico que evita que ninguna de las ramas amplíe su autoridad debilitando a la otra. *Hernández Agosto v. Romero Barceló*, 112 D.P.R. 407, 427–428 (1982); *Hernández Agosto v. López Nieves*, 114 D.P.R. 601, 612–622 (1983); *Mistretta v. United States*, 488 U.S. 361 (1989); *Morrison v. Olson*, 487 U.S. 654 (1988).

Sin embargo, la teoría de separación de poderes nunca se concibió como una estructura de carácter estático en que cada poder funcionaría en "un vacío, completamente independiente y alejada de las otras". Más bien, lo que la Constitución pretendía evitar fue descrito como sigue: "'La acumulación de *todos* los poderes, legislativo, ejecutivo y judicial, en las *mismas* manos . . .'". (Énfasis en el original.) *Banco Popular, Liquidador v. Corte*, 63 D.P.R. 66, 71–72 (1944).

Al adjudicar controversias que requieren un pronunciamiento sobre la aplicabilidad de esta doctrina, nos corresponde dilucidar la cuestión en términos de si en la operación real del sistema y en un contexto histórico determinado el poder delegado tiende a desembocar en una concentración de poder indebida en una de las ramas o en una disminución indeseable de la independencia que sea incompatible con el ordenamiento político de la Constitución. Véase Tribe, *American Constitutional Law, op. cit.*, págs. 213–218. En controversias de este tipo debemos distinguir entre "facultades que integran la entraña misma del sistema y poderes trasladables, por razones de peso, a otras ramas" (*In re Rodríguez Torres*, 106 D.P.R. 698, 709 (1978)), y a la luz de las circunstancias históricas prevalecientes, delimitar los contornos

de los poderes públicos para evitar la concentración indebida de poderes y promover el más eficiente funcionamiento del sistema.

Con esta perspectiva de una relación dinámica entre poderes gubernamentales, la creación de una segunda sesión ordinaria no constituye una indebida intromisión de la Asamblea Legislativa en las facultades de la Rama Ejecutiva. La Ley Núm. 138, *supra*, únicamente aumenta el número de días y de sesiones ordinarias en que la Asamblea Legislativa está reunida. Mediante el estatuto, la Asamblea Legislativa no asume ningún poder concedido por la Constitución a la Rama Ejecutiva. La segunda sesión ordinaria se concibe con un propósito estrictamente legislativo y contiene unos límites sobre el término de la sesión.

La facultad constitucional del Gobernador para convocar a la Asamblea Legislativa a sesión extraordinaria y para hacer nombramientos de receso no se afecta por la creación de una segunda sesión, ya que el Gobernador todavía conserva estas facultades durante el periodo entre la primera y la segunda sesión ordinaria y al final de esta última. En la medida en que la Asamblea Legislativa esté reunida por más tiempo, será más fácil para el Gobernador obtener el consenso requerido para la confirmación de los funcionarios que así lo requieran y habrá menos necesidad de hacer nombramientos de receso. Tampoco se afecta la autoridad del Gobernador para efectuar vetos de bolsillo.

Además, al amparo de la Sec. 4 del Art. IV de nuestra Constitución, *supra*, el Gobernador tiene la responsabilidad de presentar a la Asamblea Legislativa *"al comienzo de cada sesión ordinaria"* (énfasis suplido) un mensaje sobre la situación del Estado y exponer su programa legislativo para resolver los problemas más apremiantes y atender cualquier asunto fiscal que requiera una acción legislativa. Al utilizar el vocablo "cada" en esta sección, la Constitución tampoco limita el número de sesiones ordinarias a una anual y, simultáneamente, provee para que el Primer Ejecutivo se dirija a los cuerpos legislativos en cada una de ellas.

Consciente de que la legislación no violaba la separación de poderes y que contenía las salvaguardas necesarias que limitaban el término de la nueva sesión, el Primer Ejecutivo endosó la medida y comparece ante nos para defenderla. A través del extenso proceso deliberativo que caracterizó su promulgación, las dos (2) ramas de gobierno conciliaron sus diferencias y evitaron los conflictos que afectaban el delicado balance de poderes que caracteriza nuestro sistema político. Véase Diario de Sesiones de 25 de mayo de 1988, págs. 178–185.

Finalmente, en la medida en que la Asamblea Legislativa se reúna en una segunda sesión ordinaria, esta Rama tendrá más tiempo para considerar los asuntos sometidos ante su consideración y podrá estar en mejores condiciones para aumentar su productividad y efectividad en nuestra sociedad moderna.

## VII

*Conclusión*

En ausencia de una prohibición en el texto de la Constitución, y considerando que la intención de la Convención Constituyente fue establecer el principio de la continuidad en el proceso legislativo y que se concedió a la Asamblea Legislativa el poder para determinar la duración de sus sesiones, resolvemos que es constitucional la segunda sesión ordinaria creada por dicha legislación.

Ya que una segunda sesión ordinaria no constituye una indebida intromisión del Poder Legislativo en las facultades delegadas a la Rama Ejecutiva y que existen poderosas razones de política pública, eficiencia y conveniencia que justifican la citada Ley Núm. 138, el Tribunal Superior debió haber declarado sin lugar la impugnación del estatuto.

Por los fundamentos expuestos, *se revoca la sentencia dictada por el Tribunal Superior y se resuelve que la Asamblea Legislativa tiene los poderes constitucionales para crear dos (2) sesiones ordinarias anuales para así cumplir con sus responsabilidades públicas dentro de nuestro ordenamiento político.*

El Juez Asociado Señor Negrón García disintió con opinión escrita. El Juez Asociado Señor Rebollo López no intervino.

—O—

Opinión disidente del Juez Asociado Señor Negrón García.

No debemos olvidar que la Constitución fue concebida como un todo orgánico, como un cuerpo integral. No se creó como un conjunto de parcelas autónomas, desprendido de esa unidad entera que conforma su esencia. Es por esa razón que al interpretarla es preciso respetar su cabalidad; de lo contrario, nos abocamos al riesgo de trastocar la totalidad de su constancia y de alterar el cuidadoso esquema de balances de poderes.

La regla de hermenéutica a favor de una interpretación que mantenga la constitucionalidad de la ley —*Amy v. Adm. Deporte Hípico*, 116 D.P.R. 414 (1985); *Milán Rodríguez v. Muñoz*, 110 D.P.R. 610 (1981); *Negrón Soto v. Gobernador*, 110 D.P.R. 664 (1981); *P.S.P. v. Com. Estatal de Elecciones*, 110 D.P.R. 400 (1980)— y la de presunción de constitucionalidad no son absolutas. Nunca deben impedirnos definir y establecer las coordenadas correctas y los límites de las facultades de los Poderes Ejecutivo y Legislativo.

Y es que la Constitución provee un esquema de pesos y contrapesos para regir procesos duraderos, más allá de un cuatrienio en particular. No debe, pues, confundirse la armonía pasajera y el consenso coyuntural propio de un momento en que *un solo partido político controla ambas ramas*. Por esa razón la presente decisión, al igual que cualesquiera otras, tiene que superar esa visión inmediata y debe ser capaz de proyectarse hacia el futuro con mayor perspectiva.

El hecho de que los representantes máximos de las Ramas Ejecutiva y Legislativa hayan comparecido unidos a abogar por la constitucionalidad de la Ley Núm. 138 de 22 de julio de 1988 (2 L.P.R.A. sec. 1a *et seq.*) no es determinante. La controversia es más compleja. Más allá de la disertación abstracta de teoría constitucional que discurre en la opinión mayoritaria, ese frente

común nos pone nuevamente en el umbral del dilema perenne: ¿DEMOCRACIA O PARTIDOCRACIA?

A la larga tenemos un producto constitucional adulterado. Emerge debilitada la figura del Primer Ejecutivo. Ante la Asamblea Legislativa, el uso de sus prerrogativas constitucionales como herramientas para negociar, lograr consenso y adelantar legislación —incluso nombramientos— disminuye significativamente.

I

El Senador Nicolás Nogueras, Hijo instó demanda contra el Gobernador, Hon. Rafael Hernández Colón y los presidentes del Senado y de la Cámara de Representantes, Hons. Miguel Hernández Agosto y José R. Jarabo, respectivamente. Pidió que se declarara inconstitucional la mencionada Ley Núm. 138, que estableció *dos (2) sesiones ordinarias anuales* para los trabajos de la Asamblea Legislativa.[1] De acuerdo con dicho estatuto, la primera sesión ordinaria comenzaría el segundo lunes del mes de enero y se extendería hasta el 31 de mayo, mientras que la segunda se iniciaría el segundo lunes del mes de septiembre y duraría hasta el 31 de octubre.

Los demandados comparecieron y sostuvieron la constitucionalidad de la ley. Ambas partes recurrieron a los debates de la Asamblea Constituyente para apuntalar sus respectivas contenciones.

Oportunamente, el Tribunal Superior, Sala de San Juan (Hon. Wilfredo Alicea López, Juez), emitió una extensa y documentada sentencia. En virtud de un recuento histórico de las disposiciones antecesoras a la Sec. 10 del Art. III de la Constitución, L.P.R.A.,

---

[1] Durante la Sesión Ordinaria de 1987, la Asamblea Legislativa consideró una pieza similar. El Proyecto de la Cámara 1240 enmendaba la Ley Núm. 9 de 9 de abril de 1954 (2 L.P.R.A. secs. 1a y 202 *et seq.*) para disponer la celebración de dos (2) sesiones ordinarias anuales y facultar a la Asamblea Legislativa a extenderlas mediante resolución concurrente.

El 14 de junio de 1987 dicho proyecto fue objeto de un "veto de bolsillo" por el Primer Ejecutivo y se expresaron reservas sobre su validez constitucional en el memorando que le cursó el Lcdo. Lino J. Saldaña.

Tomo 1, las discusiones en la Asamblea Constituyente y el debate habido al aprobarse la Ley Núm. 9 de 9 de abril de 1954 (2 L.P.R.A. secs. 1a y 202 *et seq.*) —que instrumentó la duración de las sesiones ordinarias— concluyó que "[n]o se facultó expresamente a la Asamblea Legislativa para legislar creando más de una sesión ordinaria anual". Apéndice, pág. 40. No obstante, movido en gran parte por "consideraciones de política pública de sana administración de la justicia", amén de consideraciones de índole práctica, dispuso expresamente que su dictamen tendría carácter prospectivo.

El Gobernador y los presidentes de los cuerpos legislativos apelaron ante este Foro. La mayoría de sus integrantes han acogido sus reclamos, apoyándose en los fundamentos siguientes: (1) nuestra Legislatura está facultada para legislar sobre todo aquello que no está expresa o implícitamente prohibido por el propio texto de la Constitución (opinión mayoritaria, págs. 413–414); (2) la creación de una nueva sesión ordinaria es compatible con la naturaleza de cuerpo de carácter continuo de la Asamblea Legislativa (opinión mayoritaria, pág. 423), y (3) no constituye una indebida intromisión en las facultades de la Rama Ejecutiva porque no afecta la facultad del Gobernador para convocar a la Legislatura a sesión extraordinaria para hacer nombramientos de receso ni para efectuar vetos de bolsillo (opinión mayoritaria, págs. 426–430).

Disentimos.

## II

En su obra *Historia Constitucional de Puerto Rico*, Río Piedras, Ed. U.P.R., 1982, Vol. III, pág. 135, José Trías Monge, al iniciar el análisis histórico del *proceso legislativo* (capítulo XXXIV) expone *LA VISIÓN QUE PREDOMINÓ* en la Asamblea Constituyente *en torno a los límites del Poder Legislativo:*

> La Convención Constituyente efectuó algunos cambios de importancia en el proceso legislativo, *pero no la reforma a fondo que la ocasión ofrecía y que el país necesitaba.* Varias razones explican

este hecho: *el deseo de NO hacer una constitución muy distinta a la Ley Orgánica;* el *compromiso* ideológico y emocional que muchos delegados a la Convención, en su mayoría legisladores, tenían con *las estructuras, procedimientos y mitos de la Ley Orgánica en este campo*; y la *resistencia a* aceptar la hondura de la brecha entre la constitución escrita y la real respecto al papel de la Asamblea Legislativa. (Énfasis suplido.)

Luego de incursionar en la experiencia del Acta Foraker y del Acta Jones, el licenciado Trías Monge nos señala que para 1951, frente al Gobernador, la Asamblea Legislativa "era un cuerpo esencialmente pasivo" y que existía entre los legisladores una "frustración subyacente [que] se revelaba en *diversos modos y repercutiría ADVERSAMENTE en la redacción del Art. III de la Constitución de Puerto Rico*". (Énfasis suplido.) Trías Monge, *op. cit.,* pág. 137. Después concluye que "[o]tra manifestación, finalmente, de dicha frustración, fue el *apego a las viejas instituciones* y modos de proceder, su *identificación inconsciente* con el antiguo prestigio del parlamento, *LA CONSIGUIENTE IN-DISPOSICIÓN A CAMBIARLOS. ESTO NO SOLAMENTE CONTRIBUYÓ A LA TENDENCIA VISIBLE EN LA CONVENCIÓN CONSTITUYENTE A MANTENER EN LO POSIBLE LAS INSTITUCIONES Y USOS CONSAGRADOS EN LA LEY ORGÁNICA,* sino que causó también *el fracaso de algunas de las reformas constitucionales intentadas,* al establecer honda brecha entre la constitución real y la escrita. Veremos así, por ejemplo, cómo una de las reformas más vitales que ensaya la Convención Constituyente, *LA IMPARTICIÓN DE CARÁCTER DE CUERPO CONTINUO A LA ASAMBLEA LEGISLATIVA, NUNCA SE CONVIRTIÓ EN REALIDAD EN LA MEDIDA DESEADA Y NECESARIA".* (Énfasis suplido.) Íd., pág. 138.

La decisión mayoritaria de hoy se aparta diametralmente de esa visión. Casi cuatro (4) décadas después, una nueva generación de Jueces de este Tribunal ignora la realidad dibujada por el licenciado Trías Monge. Se intenta así superar las "frustraciones" de los delegados de la Constituyente. A esos efectos expiden una "Carta Blanca" a la Asamblea Legislativa para intervenir

peligrosamente con el delicado balance que presupone nuestro sistema de pesos y contrapesos. El resultado neto de ese dictamen es que poda significativamente unas prerrogativas básicas del Gobernador de Puerto Rico.

La principal falla metodológica de la opinión mayoritaria es su carácter fragmentado. Esto le impidió evaluar *integralmente* la verdadera panorámica que prevaleció en la Asamblea Constituyente en 1952, según se expuso antes, y por ende, la intención que quedó plasmada en la Constitución.

## III

En lo que respecta a la controversia ante nos, desde la vigencia del Acta Jones reconocimos hace siete (7) décadas que *"resulta claro que hay dos clases de sesiones que puede celebrar la Asamblea Legislativa de Puerto Rico; una que es la ordinaria,* que comienza el día en que está determinado en la ley; *la otra,* [extraordinaria,] que se celebra cuando el Gobernador la convoca para asuntos de interés público, diferenciándose ambas en cuanto al tiempo de duración de sus sesiones . . .". *Mun. de Quebradillas v. Sec. Ejecutivo,* 27 D.P.R. 147, 158 (1919).

Esta percepción —una sola sesión ordinaria anual— era el modelo legal y funcional que existía al momento de los miembros de la Asamblea Constituyente reunirse, debatir y redactar la Constitución. Fue la premisa articulada por sus delegados, incluso los protagonistas más activos que, de paso, eran abogados. De los ochenta y dos (82) delegados electos y participantes en la Asamblea Constituyente, treinta y cuatro (34) gozaban de esa condición. A tal efecto, el estudio meticuloso y exhaustivo de ese legado revela claros indicadores que desvirtúan la tesis mayoritaria. Veamos.

Por todos es conocido la influencia que sobre dicho cuerpo tuvieron los informes sometidos por la *Escuela de Administración Pública de la Universidad de Puerto Rico.* En lo atinente fueron decisivas. La obra *La nueva Constitución de Puerto Rico* recoge fielmente la realidad del modelo imperante de una sola sesión ordinaria anual.

Bajo el subtítulo *Sesiones Legislativas* se discutió el asunto, así como las posibles alternativas:

> *La frecuencia y duración de las sesiones legislativas se consideran, por lo común, problemas de conveniencia práctica.* La sesión anual es característica de los Parlamentos del Reino Unido y de los dominios. La Constitución Francesa de 1946 incluye una disposición constitucional que requiere a la Asamblea Nacional reunirse anualmente y la Constitución Italiana incluye una cláusula semejante. Esta es también la práctica en la gran mayoría de las demás naciones.
>
> En los Estados Unidos, siguiendo el ejemplo inglés, la Constitución Federal determina que el Congreso se reunirá por lo menos una vez al año. Siete de las legislaturas estatales celebran sesiones anuales, y el resto se reúne cada dos años. Las sesiones legislativas en los estados difieren mucho en su duración. En 21 estados no hay límite constitucional a la duración de las sesiones regulares. El resto fija dicho límite constitucional, o por lo menos obtiene el mismo resultado prescribiendo el número máximo de días por los que devengarán compensación los legisladores.
>
> . . . . . . . .
>
> En Puerto Rico, la Ley Foraker requería que la Cámara de Delegados se reuniera *anualmente* por no más de sesenta días pero el Gobernador podía convocar sesiones *especiales*. *Bajo el sistema vigente, la Legislatura celebra sesiones anuales por un período fijo del segundo lunes de febrero al día 15 de abril.* Las sesiones deben ser públicas y ninguna de las Cámaras puede suspenderlas por más de tres días sin el consentimiento de la otra, ni efectuarlas en otro sitio que no sea aquel en el cual están reunidas ambas. (Énfasis suplido y escolios omitidos.) *La nueva Constitución de Puerto Rico,* Río Piedras, Ed. U.P.R., Escuela de Administración Pública, 1954, págs. 384–385.

Con vista a esta exposición y experiencia, el informe concluía:

> Se acepta por lo general que las *sesiones anuales deben preferirse a las bienales.* La mayoría de los argumentos que se ofrecen en favor de estas últimas se basan en desconfianza de las legislaturas y en la creencia, a veces inconsciente, de que legislar es un mal en sí mismo. Este ya no es un criterio válido. El número creciente y la complejidad de las cuestiones públicas que requieren conside-

ración legislativa, lo mismo que el aumento de las responsabilidades del estado, han anulado los criterios tradicionales sobre las funciones del cuerpo legislativo. *Las restricciones tradicionales sobre la duración de sus sesiones son igualmente arcaicas.* Lo que importa en este caso es descubrir los medios para hacer a la maquinaria legislativa lo más responsable y eficaz posible." (Énfasis suplido y escolios omitidos.) *La nueva Constitutión de Puerto Rico, op. cit.*

A base de estas conclusiones y en virtud de unos *"argumentos muy sólidos", se recomendó "CONSERVAR EN PUERTO RICO EL SISTEMA ACTUAL DE SESIONES ANUALES y para eliminar de la Carta constitucional cualquier restricción, como la contenida en la ley Orgánica sobre la duración de las sesiones".* (Énfasis suplido.) Íd.

Lo expuesto demuestra que la interpretación que hizo la Asamblea Legislativa en la Exposición de Motivos de la citada Ley Núm. 138 —sobre este informe y las recomendaciones de la Escuela de Administración Pública— es incorrecta.(2) No apoya la validez constitucional de dos (2) sesiones ordinarias al año. Sólo sostiene la necesidad y facultad de una extensión del término. Incidentalmente, al aludir la mayoría a esa interpretación (opinión mayoritaria, pág. 421) ha incurrido en lo que podríamos caracterizar, si se nos permite acuñar la expresión, en un "anatocismo judicial-legislativo", esto es, cuando un tribunal funda la interpretación de una facultad legislativa en la interpretación que a su vez hace la propia Asamblea Legislativa.

## IV

Aparte de lo expuesto, el debate sobre varias disposiciones constitucionales y el lenguaje finalmente aprobado nos permite, sin reservas, coincidir con el licenciado Trías Monge en que la Asamblea Constituyente "man[tuvo] en lo posible las [viejas]

---

(2) Tampoco podemos perder de vista que ante la consideración de la Asamblea Constituyente estuvo sometida y fue rechazada la alternativa de un sistema de "sesiones divididas o bifurcadas". *La nueva Constitución de Puerto Rico*, Río Piedras, Ed. U.P.R., Escuela de Administración Pública, 1954, págs. 389-391.

instituciones y usos consagrados en la Ley Orgánica [Jones] ...".
(Énfasis suplido.) Trías Monge, *op. cit.*, pág. 138. Expliquémoslas.

Primeramente, en términos semánticos el uso continuo en
plural de "sesiones ordinarias" en el Informe de la Escuela
Gradüada de Administración Pública de la Universidad de Puerto
Rico, con alusión a la limitación a la *actual* duración de noventa
(90) días, en 1952 sólo podía referirse —y hacía sentido— al
*modelo existente*: una (1) sola sesión ordinaria anual.

Su análisis semántico se extiende al texto en la Sec. 1 del Art.
III de nuestra Constitución, *supra*. Su lectura sería suficiente
para disponer de esta controversia pues, como afirmara en su
estudio el Lcdo. Lino J. Saldaña, su letra es "clara e inequívoca":

> Provee que la Asamblea Legislativa "se reunirá en sesión ordi-
> naria cada año a partir del segundo lunes de enero". Al referirse en
> singular a una sesión ordinaria que comenzará cada año a partir del
> segundo lunes de enero, el significado del precepto constitucional no
> deja lugar a dudas: habrá una sola sesión ordinaria anual de la
> Asamblea Legislativa. Sólo la duración de esa única sesión ordinaria
> puede ser prescrita por ley, según indica textualmente la Sección 10
> del Artículo III. Pero no se permite a la Asamblea Legislativa
> reunirse en sesión ordinaria más de una vez al año. Fuera de esa
> única sesión ordinaria anual, según provee el texto constitucional,
> sólo se celebrarán sesiones extraordinarias cuando el Gobernador
> las convoque, que no podrán extenderse por más de veinte días
> naturales y en las que sólo podrán considerarse los asuntos especi-
> ficados en la convocatoria o en el mensaje especial que el Goberna-
> dor envía durante el curso de la sesión extraordinaria. L.J. Saldaña,
> Memorando al Hon. Rafael Hernández Colón de 22 de junio de 1987,
> págs. 3–4.

Y es que cuando en el texto de la Constitución se habla en
plural de "sesiones ordinarias", de ninguna manera se quiso decir
que podrían celebrarse varias de esas sesiones en un año. La
confusión de la opinión mayoritaria procede de la doble acepción
del término "sesión". Se entiende por "sesión", por una parte, una
unidad mayor que comprende una serie de reuniones constitutivas
durante un período amplio, abarcador. Por otra parte, también
una sesión es una unidad menor referente a una reunión; una

asamblea que puede reducirse a una hora, una mañana o un día en lo que puede ser parte en el proceso de una actividad de mayor duración.

Ahora bien, la legislación impugnada presenta escollos constitucionales que trascienden los aspectos semánticos y lingüísticos. Se trata de problemas sustantivos que chocan con el *espíritu y esencia* de nuestra Constitución. Expongámoslos.

El primer indicador lo detectamos en las facultades *expresamente* concedidas a la Asamblea Legislativa para la *ordenación de sus labores*. El Art. III, Sec. 10 de la Constitución del Estado Libre Asociado, *supra*, pág. 341, establece:

> La Asamblea Legislativa será *un cuerpo con carácter continuo* durante el término de su *mandato* y se *reunirá en sesión ordinaria cada año a partir del segundo lunes de enero*. La *duración de las sesiones ordinarias* y los plazos para la radicación y la consideración de proyectos *serán prescritos por ley*. (Énfasis suplido.)

La Sec. 21 del mismo artículo, Const. E.L.A., *supra*, pág. 347, en lo pertinente, dispone que:

> Las cámaras legislativas podrán ventilar procesos de residencia en sus sesiones ordinarias o extraordinarias. Los presidentes de las cámaras a solicitud por escrito de dos terceras partes del número total de los miembros que componen la Cámara de Representantes, *deberán convocarlas para entender en tales procesos*. (Énfasis suplido.)

Más adelante, en el Art. IV, Sec. 4 de la Constitución del Estado Libre Asociado, L.P.R.A., Tomo 1, ed. 1982, pág. 349, se le confiere al Gobernador el poder de "[c]onvocar la Asamblea Legislativa o el Senado a sesión extraordinaria cuando a su juicio los intereses públicos así lo requieran". Además, puede proclamar la ley marcial, ante lo cual la legislatura deberá reunirse inmediatamente a iniciativa propia para ratificar o revocar esa proclama.

La lectura armoniosa de estas disposiciones refleja que la Asamblea Legislativa sólo puede reunirse a iniciativa propia en

dos (2) ocasiones: para considerar procesos de residencia o ratificar o revocar una proclama ejecutiva de la ley marcial. *Esta limitación no fue fortuita.* Inicialmente, la propuesta original iba encaminada a reconocerle a ambos cuerpos la facultad de reunirse en sesión extraordinaria, previa convocatoria de sus presidentes, a solicitud escrita de dos (2) terceras partes de los miembros de la Cámara de Representantes, para ventilar procedimientos de residenciamiento. A esta propuesta, el delegado Reyes Delgado sometió una enmienda para eliminar la frase "a los fines de ventilar procedimientos de residenciamiento", con el propósito de expandir esa facultad. De ese modo, la Asamblea Legislativa podría reunirse cuando dos (2) terceras partes de cada uno de los cuerpos lo solicitara. 2 Diario de Sesiones de la Convención Constituyente 838-839 (1961).

Subsiguientemente se propuso una enmienda para que dos (2) terceras partes de cualquiera de las Cámaras pudieran convocar la sesión extraordinaria. Diario de sesiones, *supra*, pág. 838. El delegado Gelpí entonces sugirió este lenguaje:

> Las Cámaras Legislativas podrán reunirse en sesión extraordinaria previa convocatoria de los presidentes de las mismas a solicitud por escrito de dos terceras partes de cada cámara para ventilar los asuntos especificados en tal convocatoria así como para los procedimientos de residenciamiento. Diario de Sesiones, *supra*, pág. 839.

Después, el delegado Alemañy Silva recomendó que el texto consignara la expresión siguiente: "Disponiéndose que cuando dos terceras partes de los miembros de cada una de las cámaras así lo pidan por escrito al gobernador, éste estará obligado a convocar a sesión extraordinaria a la Asamblea Legislativa." Diario de Sesiones, *supra*, pág. 841. Esa propuesta generó la oposición del señor Valentín Vizcarrondo, quien señaló:

> . . . eso hace una intervención de dos poderes: o sea, el ejecutivo y el legislativo; el legislativo ordenándole al ejecutivo a convocar la Legislatura de Puerto Rico. Y, por esa razón, nosotros nos oponemos a esta enmienda. Si las cámaras tienen el poder del veto sobre

el gobernador, no veo cómo podrían ordenarle al gobernador citar la legislatura haciendo una intromisión de ambos poderes que aquí se han tratado de separar. Diario de Sesiones, *supra*, pág. 842.

Así debatida, la enmienda fue *derrotada*.

Estos antecedentes revelan que la Asamblea Legislativa sólo tiene facultad para *autoconvocarse* en sesión extraordinaria en dos (2) ocasiones. Las demás instancias sólo ocurren cuando el Gobernador la convoca para tratar los asuntos que él ha determinado. Prevaleció, al decir del licenciado Trías Monge, "el control [ejecutivo] sobre la celebración de sesiones extraordinarias de la Asamblea Legislativa y sobre su agenda". Trías Monge, *op. cit.*, pág. 153.

No obstante, resulta claro que se eliminó el límite de *duración* de las sesiones ordinarias, dejándose ese asunto en manos de la Legislatura. Sin embargo, esa autorización no equivale ni se extiende a una facultad para establecer segundas, terceras o más sesiones *ordinarias*. El salto histórico, conceptual y jurídico que hoy da la mayoría es muy grande. *El abismo constitucional es inmenso. El carácter continuo de la Asamblea Legislativa no tiene ese significado ni equivalencia.*

Otro debate que arroja luz es el relativo al Art. V, Sec. 6 de la Constitución del Estado Libre Asociado, L.P.R.A., Tomo 1, pág. 357, que trata sobre *la facultad concedida a este Tribunal para adoptar reglas procesales y evidenciarias* y que, en lo pertinente, preceptúa que las "reglas así adoptadas se remitirán a la Asamblea Legislativa *al comienzo de su próxima sesión ordinaria y regirán* sesenta días después *de la terminación de dicha sesión,* salvo desaprobación por la Asamblea Legislativa, la cual tendrá facultad, tanto en dicha sesión como posteriormente, para enmendar, derogar o complementar cualquiera de dichas reglas, mediante ley específica a tal efecto". (Énfasis suplido.)

El proceso que culminó con la aprobación de este texto suscitó este interesante diálogo:

Sr. IRIARTE: Pero digo, si toma acción, si se envían las reglas a la Asamblea Legislativa cuando *está en sesión,* la Asamblea Legis-

lativa presenta un proyecto de ley, ¿quiere decir que las reglas están suspendidas hasta que este proyecto se apruebe?

Sr. GUTIÉRREZ FRANQUI: O no se apruebe.

Sr. IRIARTE: ¿O no se apruebe?

Sr. GUTIÉRREZ FRANQUI: Hasta que recese *esa sesión.*

Sr. IRIARTE: Pero se ha de entender eso así. No lo dice aquí.

Sr. GUTIÉRREZ FRANQUI: Parece que sí.

Sr. IRIARTE: Yo creo que no.

Sr. GUTIÉRREZ FRANQUI: Lo dice claro, dice: "Las reglas así adoptadas se remitirán a la Asamblea Legislativa *al comienzo de su próxima sesión ordinaria y no comenzarán hasta la terminación de dicha sesión."*

. . . . . . .

Sr. IRIARTE: *¿Y si la Asamblea Legislativa se declara, como el Congreso de los Estados Unidos, en sesión permanente?*

Sr. GUTIÉRREZ FRANQUI: Es terminar la sesión. Si es una sesión que no termina, pues no ha terminado la sesión.

Sr. IRIARTE: Creo que eso va a necesitar acción, porque esto puede quedar pendiente. *Tengo entendido que lo que estamos haciendo en el Comité Legislativo es determinar que continuamos como el Congreso de los Estados Unidos.*

Sr. GUTIÉRREZ FRANQUI: *NO, NO. QUE TENGA EXISTENCIA CONTINUA PERO NO SESIÓN PERMANENTE. DIOS NOS LIBRE.*

Sr. IRIARTE: *DIOS NOS LIBRE DE LA SESIÓN PERMANENTE, PERO PODREMOS ESTAR EN SESIÓN PERMANENTE, CASI LO ESTAMOS. SOLAMENTE QUE TENEMOS LAS SESIONES EXTRAORDINARIAS QUE SUSTITUYEN LA SESIÓN PERMANENTE.*

. . . . . . .

Sr. GUTIÉRREZ FRANQUI: Bueno, yo creo que se puede hacer de las dos maneras. Creo que hasta esa fue mi idea original que después fue sustituida por ese lenguaje. Yo creo que es lo mismo, hay compañeros que creen que no se le debe poner término a l[a] legislatura y que se debe dejar durante la duración de la sesión, hay

compañeros que aceptarían esa proposición de noventa días o algo por el estilo, pero la comisión entendió, o prevaleció en la comisión el criterio en la mayoría de los miembros de la comisión de que debía dejarse a la legislatura la consideración de estas reglas *hasta la terminación de sus sesiones en el momento que las termine. Sesión Ordinaria.* Diario de Sesiones, *supra,* Vol. 1, págs. 607–608.

Igual conclusión emana de varios pasajes del debate habido respecto al deber del Gobernador —consignado en Art. IV, Sec. 4, Const. E.L.A., *supra,* pág. 349— de "[p]resentar a la Asamblea Legislativa, al comienzo de *cada* sesión ordinaria, un mensaje [anual] sobre la situación del Estado . . .". (Énfasis suplido.) Veamos:

Sr. GUTIÉRREZ FRANQUI:
Ahora bien, mi objeción a la enmienda del compañero: yo entiendo que lo que él propone que se requiera, está requerido en este lenguaje. Si examinamos el lenguaje de la proposición, *ésta dispone que el Gobernador presentará a la Asamblea Legislativa, al comienzo de cada sesión ordinaria un mensaje escrito . . . además un informe conteniendo los datos relativos a los recursos del Tesoro de Puerto Rico.*

. . . . . . . .

Sr. NEGRÓN LÓPEZ: Deseo contestar al delegado señor Iriarte explicándole . . . . El presupuesto comprende todas las leyes de asignaciones, que no necesariamente tienen que hacerse en una sola pieza legislativa, que no necesariamente tienen que hacerse mediante un proyecto de ley y *que siquiera tienen que hacerse a través, en el curso, de una sola sesión legislativa . . . .* Si se decide iniciar un programa de gastos del Gobierno de Puerto Rico, de desembolsos de fondos públicos para *cualquier fin después de haber recesado la Asamblea Legislativa en su sesión ordinaria* y después de haberse consignado el presupuesto, habría un obstáculo constitucional para hacer una ley complementaria de presupuesto, una ley distinta de asignaciones.

SR. GARCÍA MÉNDEZ: Señor Presidente

. . . . . . . . .

Fundamento de la enmienda, señor Presidente-brevemente. Si se deja esta sección sin esa enmienda esto equivaldría a que el poder ejecutivo sustituiría en sus poderes de poner en ejecución el

presupuesto anterior a la Asamblea Legislativa *por todo un año hasta tanto se reuniera de nuevo en sesión ordinaria la Asamblea Legislativa, mientras que si es hasta tanto la Asamblea Legislativa puede proceder a aprobar el nuevo presupuesto y a su vez,* éste es aprobado como se ordene por ley, la actitud del Gobernador sería una de índole transitoria para no dejar que quede en suspenso el funcionamiento del gobierno en tanto la Asamblea Legislativa actúa con los poderes que a ese efecto tiene. Ese es el fundamento. (Énfasis suplido.) Diario de Sesiones, *supra,* Vo. 1, págs. 882–890.

La importante prerrogativa de hacer *nombramientos de receso* también contiene lenguaje orientador. Señala:

Nombrar, en la forma que se disponga por esta Constitución o por ley, a todos los funcionarios para cuyo nombramiento esté facultado. El Gobernador podrá hacer nombramientos cuando la Asamblea Legislativa no esté en *sesión. Todo nombramiento que requiera el consejo y consentimiento del Senado o de ambas cámaras quedará sin efecto al levantarse la siguiente sesión ordinaria.* (Énfasis suplido.) Art. IV, Sec. 4, Const. E.L.A., *supra,* pág. 349.

Este texto, en lo pertinente, produjo una extensa discusión entre algunos delegados, en ocasión del licenciado Fonfrías sugerir el lenguaje enmendatorio siguiente:

Todo nombramiento, que requiera la aprobación del Senado, deberá ser enviado por el Gobernador a dicho cuerpo legislativo en la *primera sesión ordinaria o extraordinaria de dicho Senado, celebrada inmediatamente después de efectuado el nombramiento.*

. . . . . . . . .

Pudiera ser que el [jefe] ejecutivo hiciera un nombramiento y que en ese momento no lo enviara al Senado, en la *primera sesión ordinaria y extraordinaria,* y que ese nombramiento hecho resultara que fuera de un individuo que no llenara a capacidad, con inteligencia, con honradez, con probidad, el puesto para el cual fue nombrado, y en esta forma quedaría lesionado el poder legislativo, que no tiene la facultad para rechazar o endosar debidamente ese nombramiento. En esta forma, con la enmienda nuestra, se ordena al [jefe] ejecutivo que envíe al Senado todo nombramiento que haga, que sea de nombramiento del Senado. Y además se le dice en qué momento debe remitir ese nombramiento al alto cuerpo legislativo, que es el Senado.

Sr. SECRETARIO: Todo nombramiento que requiera la aprobación del Senado deberá ser enviado por el Gobernador a dicho cuerpo legislativo en la *primera sesión ordinaria o extraordinaria de dicho Senado efectuado inmediatamente después de efectuado el nombramiento.*

Sr. GELPÍ: ¿La idea es que se remita por el Gobernador al Senado el primer día de la *primera sesión ordinaria o extraordinaria?* El primer día que *no dentro de la sesión, sino el primer día de la sesión.* Porque lo que sucede actualmente . . . . Si me permiten argumentar la enmienda . . . .

Sr. SECRETARIO: La enmienda a la enmienda es para que diga que "todo nombramiento que requiere la aprobación del Senado, deberá ser enviado por el gobernador dentro *del primer día de la primera sesión".*

Sr. PARKHURST: Para una enmienda.

Sr. PRESIDENTE: Señor Parkhurst.

Sr. PARKHURST: Que diga *"Toda sesión legislativa ordinaria o extraordinaria".*

Sr. GELPÍ: Secundo.

Sr. PRESIDENTE: Debidamente secundada la enmienda a la enmienda.

Sr. FONFRÍAS: No la acepto.

Sr. PRESIDENTE: No se acepta. Si no hay discusión se va a someter a discusión la enmienda a la enmienda. ¿Quiere un turno?

Sr. PARKHURST: Señor Presidente y compañeros delegados: Si el . . . si *la sesión ordinaria del Senado tiene el derecho de confirmar los nombramientos que haga el Gobernador, también lo tienen las sesiones extraordinarias y no veo ningún motivo por el cual el Gobernador no deba someter sus nombramientos a sesiones extraordinarias, igual que a las sesiones ordinarias.* Es lo único.

Sr. FONFRÍAS: Vamos a combatir la enmienda a la enmienda sugerida por el señor Parkhurst. Nuestra oposición a la enmienda se manifiesta sencillamente en que aun cuando en nuestra enmienda no aparece "sesiones extraordinarias", eso, en forma alguna, impe-

dirá al [jefe] ejecutivo enviar al Senado en alguna sesión extraordinaria, cualquier nombramiento que él hiciere, no importa *en cuál de esas sesiones extraordinarias fuere.*

*El cumplimiento de esas sesiones se hace en la sesión ordinaria,* pero eso no impedirá que el [jefe] ejecutivo lo pudiera hacer en cualquier sesión extraordinaria.

. . . . . . . . . .

Sr. IRIARTE: Me estoy refiriendo a la enmienda del compañero Fonfrías. Lo que acaba de leer, el compañero, que es su enmienda, que es la que dispone, que *hasta la sesión ordinaria del Senado* no se le sometan al Senado para su aprobación, o confirmación, *los nombramientos hechos por el Gobernador cuando no está el Senado en sesión. Por eso digo, ¿qué razón hay para dejar pendiente a veces por un año, de sesión a sesión del Senado, ordinaria, que serán anualmente las sesiones[?],* ¿qué razón ha[y] para dejar durante *un año* pendiente de confirmación un nombramiento? *Para mantener en rehenes a un funcionario pendiente de la confirmación de su nombramiento,* ¿Qué razón hay para eso?

. . . . . . . . . .

Sr. IRIARTE: *Es muy mala la práctica de dejar pendiente esos nombramientos por un período indefinido de una sesión ordinaria a otra del Senado, porque puede ser grandemente molesto para los candidatos.* Es muy probable que se reúna el Senado en sesión extraordinaria y se le sometan todos los nombramientos hechos en receso del Senado por el Gobernador de Puerto Rico y que han debido serlo con el perfecto conocimiento de los oficiales correspondientes, senadores o representantes de los distritos en donde se han llenado esos nombramientos. Por eso digo que debe incluirse la enmienda esa, que ahorita se rechazó, de que fuera también en las sesiones extraordinarias donde se consideraban nombramientos, *y que se dejen solamente de año a año, para hacer las confirmaciones de los empleados.* (Énfasis suplido.) 3 Diario de Sesiones de la Convención Constituyente 1851–1854 (1952).

A la luz del anterior y minucioso análisis podemos concluir, sin margen de duda, que el sistema que sirvió de modelo fue el de una sola sesión ordinaria anual. Así quedó cristalizado en la Constitución. Nunca se propuso ni debatió la necesidad de VARIARLO. Por el contrario, las recomendaciones de la Escuela de Administración Pública fueron "conservar en Puerto Rico el sistema *actual* de sesiones anuales", pero eliminar la restricción sobre la

duración contenida en el Acta Jones. La confusión mayoritaria *radica* en que ha sido incapaz de distinguir los conceptos *frecuencia* y *duración*. Ha asimilado ambos conceptos.

## V

En cuanto al segundo fundamento en que descansa la opinión mayoritaria —carácter continuo de la Asamblea Legislativa— debemos señalar que es improcedente la analogía, con la situación del Congreso de Estados Unidos. Allí, la idea de "cuerpo permanente" es propia de su dinámica peculiar, producto del modo de elegir a los congresistas, los términos de sus cargos y las demás clasificaciones establecidas en el Art. I, Sec. 3 de la Constitución federal, L.P.R.A., Tomo 1. Un tercio de los escaños del Senado están sujetos a renovación cada dos (2) años. Por ende, el sistema exige una continuación funcional total para evitar que las labores se vean interrumpidas. Así lo entendió claramente el licenciado Gutiérrez Franqui cuando rechazó la analogía y le indicó al delegado Iriarte: "NO, NO. QUE TENGA EXISTENCIA CONTINUA PERO NO SESIÓN PERMANENTE. DIOS NOS LIBRE." Diario de Sesiones, *supra*, Vol. 1, pág. 608.

Nuevamente son pertinentes las expresiones del licenciado Saldaña:

> El precepto de que la Asamblea Legislativa "será un cuerpo con carácter continuo durante el término de su mandato" *no desvirtúa ni se refiere a la disposición que ordena una sola sesión ordinaria anual.* La continuidad tampoco elimina el control sobre la celebración de sesiones extraordinarias de la Asamblea Legislativa y sobre su agenda que la Sección 10 del Artículo III mantiene en las manos del Gobernador. Sería absurdo sostener que la disposición sobre el carácter continuo del cuerpo que aparece en la primera oración de la Sección 10 del Artículo III está en conflicto con otras disposiciones que aparecen en la misma sección. La continuidad del cuerpo no incluye la aprobación de leyes, la confirmación de nombramientos u otros actos legislativos para la validez de los cuales se necesita que la Asamblea Legislativa "esté en sesión". Sólo permite que "las comisiones legislativas puedan continuar ejerciendo sus funciones

después de la fecha en que finaliza la sesión ordinaria", según resolvió nuestro Tribunal Supremo en *Hernández Agosto v. Ortiz Montes*, 115 D.P.R. 564 (1984), y en *Dapena Thompson v. Colberg Ramírez*, 115 D.P.R. 650, 653 (1984). (Énfasis suplido.) Saldaña, *supra*, págs. 4–5.

## VI

Finalmente, la ley cuya constitucionalidad hoy sostiene la mayoría limita peligrosa y potencialmente el poder de veto del Primer Ejecutivo.

El Gobernador tiene, también, el poder de vetar medidas legislativas. Puede hacer uso de tres formas de veto: el ordinario, el de bolsillo (*pocket veto*), y el de las partidas (*item veto*). El veto ordinario se produce cuando el Gobernador devuelve una medida con sus objeciones a la cámara de origen dentro de los diez días (exceptuando los domingos), contados a partir de la fecha en que él la hubiera recibido. En ese caso la medida puede convertirse en ley si las cámaras la reconsideran y la aprueban por dos terceras partes del número total de los miembros que componen cada una de ellas. Si la Asamblea Legislativa levanta sus sesiones antes de expirar el plazo de 10 días que la Constitución da al Gobernador para aprobar o rechazar el proyecto de ley, éste queda relevado de la obligación de devolverlo con sus objeciones en caso de que no lo apruebe. En tal caso, el proyecto se convierte en ley sólo si el Gobernador lo firma dentro de los treinta días de haberlo recibido. Si no lo firma, entonces se produce el veto de bolsillo. El tercer tipo de veto, el de partidas, se aplica al proyecto de asignación de fondos. La Constitución autoriza al Gobernador a eliminar una o más partidas o disminuir las mismas, y reducir al mismo tiempo los totales correspondientes. La Constitución no le da, sin embargo, el poder de aumentarlas. El veto de partidas facilita la aprobación de los proyectos de asignaciones y hace menos necesaria la aplicación de la disposición constitucional según la cual si en un año no se aprueba el proyecto de asignaciones queda vigente el presupuesto del año anterior. (Citas omitidas.) C. Ramos de Santiago, *El Gobierno de Puerto Rico*, Río Piedras, Ed. Universitaria, 1979, pág. 606.

No es suficiente afirmar *escuetamente* que la ley impugnada no afectará la facultad del Gobernador para efectuar vetos de bolsillo. Opinión mayoritaria, pág. 427. Todo lo contrario.

· Por razones que no nos incumbe ahora precisar y juzgar, sabido es que la Legislatura aprueba una parte sustancial de sus medidas en las postrimerías de la sesión ordinaria. Siempre que los trabajos cesen antes de expirar el plazo de diez (10) días para la aprobación o el rechazo del proyecto de ley, el Gobernador podrá vetarlo. De esta manera, bajo el esquema de una sola sesión ordinaria, el veto era efectivo por un período mínimo de seis (6) meses, es decir, hasta que comenzara la sesión ordinaria del año siguiente. Ese período le permitía al Gobernador estudiar con mayor detenimiento la legislación vetada, ejercer inteligentemente su poder de negociación y, libre de presiones, convocar a una asamblea extraordinaria de entenderlo pertinente y necesario.

Con el nuevo esquema —dos (2) sesiones ordinarias anuales— esa facultad del Ejecutivo se reduce sustancialmente. Ahora la Legislatura podrá pasar sobre el veto del Gobernador y aprobar una medida en la segunda sesión ordinaria del año en cuestión. Con el voto de dos (2) terceras partes de sus miembros, y sin límites ni controles constitucionales, este ciclo puede continuar repitiéndose, mermando paulatinamente el poder real del Primer Ejecutivo. Y es que bajo la interpretación mayoritaria nada impedirá que en el mañana la Asamblea Legislativa establezca *terceras* o más sesiones ordinarias anuales con los efectos antes expresados.

En *Silva v. Hernández Agosto*, 118 D.P.R. 45, 57 (1986), reiteramos que "[l]a teoría de la separación de poderes requiere que las facultades delegadas por el pueblo en la Carta Constitutiva se distribuyan entre las tres ramas. *Su premisa es evitar la concentración de poderes en una sola*". (Énfasis suplido.)

Es evidente que la Ley Núm. 138, *supra*, trastoca sustancial y peligrosamente el esquema de balance de poderes vislumbrado por los forjadores de nuestra Constitución. Indiscutiblemente, debilita la figura del Gobernador ante la Rama Legislativa al afectar su facultad para convocar a asamblea extraordinaria, hacer nombramientos de receso y ejercer eficazmente el poder del veto.

Una nota cautelar final. Se habrá notado que nuestro disentir no cuestiona las necesidades legítimas que tuvo la Asamblea Legislativa para ampliar el término de sus labores. Sólo evaluamos el medio escogido de una *segunda* sesión ordinaria anual. La gran diferencia con la mayoría —más allá de una interpretación del legajo constitucional— es nuestra visión de que en una democracia las soluciones a los problemas tienen que canalizarse por las vías constitucionales. En este sentido, resulta claro que más allá de su sabiduría, LA NECESIDAD LEGISLATIVA NO ES SINÓNIMO DE FACULTAD CONSTITUCIONAL IRRESTRICTA.

Por los fundamentos expuestos, confirmaríamos el decreto de inconstitucionalidad del tribunal de instancia.