Voto particular disidente emitido por la
Jueza Asociada Se-ñora Fiol Matta,
al cual se une el Juez Presidente Señor Hernández Denton.
Al aprobar las dos Resoluciones que motivan mis expre-siones, este Tribunal utiliza su función como intérprete final de la Constitución de Puerto Rico para traspasar los límites al ejercicio de ese poder que la propia Constitución le impone. El que esta decisión sea irreversible hasta tanto la mayoría decida otra cosa no los convierte en dueños de la Constitución ni en sus autores. Nuestro llamado es a ser protectores de la voluntad del Pueblo constituido, y esa voluntad, plasmada en nuestra Ley Suprema, dicta que nuestro poder para interpretar la Constitución no es ilimi-tado; no nos permite construirla como nos plazca. Todo po-der, incluyendo el del Tribunal Supremo, tiene límites. Sin embargo, la lógica de una mayoría del Tribunal parece co-dificar la infalibilidad judicial; en efecto, parece proclamar que, como somos los intérpretes de la Constitución, por de-finición, no podemos violarla.(1) La realidad es que la ver- *636 dadera Constitución, voluntad viva del Pueblo, es mucho más que el razonamiento errado de un momento. El Pueblo retiene siempre la potestad de revocarlo.
HH
Una mayoría de este Tribunal aprobó tina Resolución mediante la cual pretende, no sólo reglamentar, sino ejer-cer el control total sobre las funciones administrativas de investigación y fiscalización respecto al uso de recursos en la Rama Judicial.(2) Al hacerlo, intenta fundamentar su acción en la Sección 7 del Artículo V de la Constitución de Puerto Rico. Dicha sección lee:
El Tribunal Supremo adoptará reglas para la administra-ción de los tribunales las que estarán sujetas a las leyes rela-tivas a suministros, personal, asignación y fiscalización de fondos, y a otras leyes aplicables en general al gobierno. El Juez Presidente dirigirá la administración de los tribunales y nombrará un director administrativo, quien desempeñará su cargo a discreción de dicho magistrado.(3)
Entiende la mayoría que esta sección permite al Tribunal adoptar el Reglamento contenido en la Resolución y decretar la suspensión de rma investigación sobre el uso de recursos en la Rama Judicial ordenada por la Oficina de Administración de los Tribunales (OAT). El examen sose-gado de la disposición constitucional, su historial y su fun-ción en nuestro esquema constitucional, contradice esa conclusión.
*637 La exposición de motivos de la Resolución sostiene que la Sección 7 faculta al Pleno del Tribunal para adoptar reglas de naturaleza administrativa respecto al momento y a la manera en que se fiscalizarán los fondos de la Rama Judicial, a expensas de las facultades del Juez Presidente para hacer lo propio. Esto no lo dice el texto de la Sección 7 cuando establece, como condición al ejercicio del poder de reglamentación, que las reglas adoptadas cumplan, entre otras, con “las leyes relativas a [la] fiscalización de fondos” públicos. No hay, pues, autorización expresa para adoptar reglas sobre la fiscalización de los fondos de la Rama Judicial. Debemos, entonces, interpretar el texto constitu-cional para determinar si dicha facultad surge implícita-mente del mencionado texto o del esquema constitucional en general.
La propia Sección 7 dispone que la dirección adminis-trativa de la Rama Judicial corresponde al Juez Presidente. Su poder constitucional es de tal magnitud que la selección y remoción del director administrativo de los tribunales queda a su total discreción. Examinado el texto de la Sección 7, es evidente que el Tribunal Supremo tiene un rol constitucional en la administración de los tribunales. Pero dicho poder no llega a los extremos a los que pretende llevarlo la mayoría en las resoluciones certificadas. Estas, no importa sus títulos, no son meras reglas ni se limitan a designar miembros de una Comisión. Más bien, trastocan el esquema constitucional de adminis-tración, invadiendo, por un lado, el poder otorgado exclusi-vamente al Juez Presidente y, por el otro, violando las fron-teras del poder regulatorio compartido por el Pleno, que, dicho sea de paso, incluye al propio Juez Presidente.
Al interpretar una disposición constitucional como la Sección 7 del Artículo V, no podemos caer en la tentación de limitar nuestros esfuerzos a un análisis superficial. Los conceptos constitucionales no son palabras adoptadas ca-sualmente; son parte de un diseño delicado, cuyo fin es *638 evitar lo que hoy se ha materializado: la concentración del poder. (4) La mayoría parece invitarnos a que interpretemos la Sección 7 de la manera siguiente: esta sección atiende todo lo relacionado con la administración de la Rama Judicial y, como se usa la misma palabra “administración” para referirse tanto al Tribunal Supremo como al Juez Presi-dente, debemos concluir que el Tribunal reglamenta toda la administración, el Juez Presidente ejecuta y el director administrativo facilita. Pero el asunto no es tan sencillo.(5) Esta interpretación en extremo textualista es impropia para el análisis de un texto constitucional. (6) Ni siquiera los originalistas y textualistas, como el Juez Antonin Sca-lia, proponen este enfoque. Por el contrario, reconocen que, *639 cuando se trata de la Constitución, el textualismo y la in-terpretación sistemática resultan insuficientes.(7)
Curiosamente, los dos temas más discutidos al deba-tirse esta disposición durante la Convención Constituyente fueron los relacionados a la fiscalización de los fondos pú-blicos y al rol exclusivo del Juez Presidente en la adminis-tración cotidiana de la Rama Judicial. Veamos este inter-cambio entre los delegados Muñoz Rivera y Ramos Antonini sobre el alcance de lo que la Sección 7 eventual-mente dispondría al respecto:
Sr. MUÑOZ RIVERA: ... Si cuando se usa aquí la frase “fis-calización de fondos públicos” incluye la fiscalización previa al desembolso de los fondos además de la fiscalización posterior.
Sr. RAMOS ANTONINI: Esta materia está gobernada por la voluntad legislativa según dispongan las leyes.
... Por eso dice ahí: sujeta a la aplicación general de las leyes aplicables al gobierno en general.
Sr. MUÑOZ RIVERA: ¿La Asamblea Legislativa tiene el po-der para determinar que los fondos asignados al Tribunal Supremo sean fiscalizados previamente?
Sr. RAMOS ANTONINI: Claro.(8)
Ante una pregunta semejante del delegado Valentín Vizcarrondo, esta vez sobre el significado de la frase “otras leyes aplicables” como restricción al poder del Tribunal Supremo apara adoptar reglas, el delegado Ramos Antonini afirmó:
Compañero, cualquier ley que pueda ser aplicable en materia *640 de administración a cualquier rama de gobierno será aplicable al Tribunal Supremo de Puerto Rico en materia de administración. (9)
Resulta, pues, meridianamente claro que la frase “suje-tas a ... [la] fiscalización de fondos” en la primera oración de la Sección 7, que la mayoría enfatiza para afirmar su facultad no sólo para aprobar reglas sobre este asunto sino para revocar la decisión de iniciar una investigación auto-rizada por el Juez Presidente, no le concede al Tribunal facultad alguna. El único efecto de esta parte de la Sección 7 es el que indica el texto: someter el poder de reglamentar la administración de los tribunales a las leyes aprobadas por la Asamblea Legislativa para el Gobierno en general. El Pleno del Tribunal Supremo no puede derivar de esa oración la facultad de revocar las decisiones administrati-vas del Juez Presidente ni arrogarse la función exclusiva de reglamentar cómo se fiscalizarán los recursos de la Rama Judicial. Esa posibilidad fue descartada por la Con-vención Constituyente.
Pero hay más. Es cierto lo que afirma la exposición de motivos de la Resolución que aprueba las llamadas “Re-glas”: la Sección 7 del Artículo V debe interpretarse, no aislando sus disposiciones, sino en su totalidad. Precisa-mente, al contraponer la primera oración de esta sección con la segunda, se hace más patente el error de análisis de la mayoría y es obligada la conclusión de que ésta ha usur-pado y concentrado un poder que la Constitución expresa-mente dividió.
La Sección 7 otorgó algunas facultades de manera exclu-siva al Juez Presidente y otras de manera compartida en-tre el Pleno y el Juez Presidente. La segunda parte de la Sección 7 delega expresamente en el Juez Presidente el poder de dirigir la administración de los tribunales. Esa facultad es exclusiva. El Pleno del Tribunal Supremo no *641 tiene autoridad constitucional para administrar la Rama Judicial; solamente tiene el poder para adoptar reglamen-tación en esa dirección. La mayoría comete dos errores, cada uno la causa del otro.
En primer lugar, la mayoría concluye que el poder del Juez Presidente para administrar la Rama no es exclusivo. Es decir, confunde el poder del Pleno para adoptar reglas sobre la administración de los tribunales con la facultad de administrar la Rama Judicial. Reglamentar la administra-ción no es administrar. Si ese fuese el caso, el poder de la Asamblea Legislativa para adoptar leyes conllevaría el po-der para administrar la cosa pública en Puerto Rico. En segundo lugar, la mayoría concluye que el poder para re-glamentar es exclusivo del Pleno, por lo cual puede utilizar ese poder para revocar una decisión administrativa del Juez Presidente. La lógica de este razonamiento, franca-mente, se me escapa. En esencia, consiste en concluir que, si se tiene poder para reglamentar, se puede reglamentar todo y en cualquier momento: antes, durante y después. Lo que ocurre es que la Constitución no es una ecuación matemática. (10) El balance de poderes se da al separar unos y compartir otros. No cabe duda que el poder del Juez Pre-sidente de dirigir la administración de la Rama Judicial incluye la facultad para autorizar investigaciones sobre el uso de recursos. Sin embargo, la mayoría confunde su po-testad para adoptar reglas con la autoridad para privar al Juez Presidente de la facultad para ejercer las suyas, en este caso, la de ordenar o autorizar investigaciones. En *642 cuanto al poder de velar por el buen uso de los recursos de la Rama, la Sección 7 de la Constitución lo otorga a ambos.
El debate en la Convención Constituyente exige y con-firma esta conclusión. Al considerarse la Sección 7, varios delegados propusieron enmiendas con el fin de limitar, aunque mínimamente, el rol del Juez Presidente como ad-ministrador de la Rama Judicial. En particular, se preten-día condicionar las facultades del Juez Presidente para es-coger y remover al director administrativo y compartir ese poder con el Pleno del Tribunal Supremo. Todas esas en-miendas fueron derrotadas.
En primera instancia, refiriéndose al director adminis-trativo, el delegado Lino Padrón Rivera propuso añadir a la Sección 7 la frase “mientras observe buena conducta”, después de “a discreción de dicho magistrado”. El propósito de la enmienda se dirigía a evitar que un director adminis-trativo competente fuera cesanteado por un nuevo Juez Presidente. Al oponerse a dicha medida, el delegado Ramos Antonini expresó lo siguiente:
... La mejor manera de pensar para resolver sobre esta en-mienda es entender cuál es el propósito de este artículo. El propósito de este artículo es que el de que la responsabilidad de la administración de los tribunales de justicia recaiga en el presidente del Tribunal Supremo, y la letra del artículo al dis-poner “el Juez Presidente dirigirá la administración de los tribunales y nombrará un director”. De manera que a quien hay que proteger aquí es, en primer término, al poder judicial, en el sentido de garantizarle eficiencia en su funcionamiento por su administración.(11) En segundo término, a quien hay que proteger aquí es al Juez Presidente del Tribunal Supremo en el desempeño de su responsabilidad y descargue de su autoridad para que pueda cumplir con la encomienda de la constitución que le dice que él dirigirá la administración. ...
*643 [P]uesto que donde hay que fijar la atención para resolver esta enmienda es en la responsabilidad y en la autoridad del Juez Presidente, no debemos en forma alguna coartar su liber-tad para su eficiencia ..,.(12)
Nada de lo expuesto anteriormente faculta al Pleno del Tribunal Supremo para usurpar los poderes delegados al Juez Presidente por la Constitución, ya sean los exclusivos o los compartidos.(13) Por el contrario, la Convención Cons-tituyente prohibió tal proceder. Trías Monge lo confirma de manera categórica: “[f]ue parte esencial de la intención le-gislativa evitar a todo trance huella alguna de administra-ción colegiada.”(14) Lo que se pretendía con la Sección 7 era llevar a cabo una separación doble del poder. En primera instancia, entre las Ramas: la primacía de la Rama Judicial sobre las demás en cuanto a su propia administración. En segundo lugar, al interior de la Rama: la primacía del Juez Presidente sobre el Pleno del Tribunal en la adminis-tración propia del sistema de tribunales.(15)
*644 Nuestra jurisprudencia siempre ha reconocido la defe-rencia debida a las prerrogativas constitucionales del Juez Presidente. En Negrón Soto v. Gobernador, nos enfrenta-mos a la dicotomía que se produce cuando el Director Ad-ministrativo de los Tribunales es, además, un juez.(16) En ese caso, atendimos dos asuntos importantes. En primer lugar, separamos con meridiana claridad la función admi-nistrativa del quehacer adjudicativo judicial, distinción que la mayoría no reconoce en esta ocasión, pues simultá-neamente adopta un reglamento administrativo y adjudica una controversia que aún no se le ha presentado al amparo de las reglas recién adoptadas. En segundo lugar, en Ne-grón Soto v. Gobernador reconocimos “[l]a amplia facultad otorgada al Juez Presidente .. .”.(17) Hoy, esa “amplia facul-tad” ni siquiera incluye la potestad de autorizar una inves-tigación sobre el uso de los recursos en la Rama Judicial.
Al interpretar un texto constitucional no podemos ex-traerlo o separarlo artificialmente de las fuerzas históricas que le dieron vida. Nadie pretendería abstraer la Constitu-ción de Estados Unidos de América de su contexto revolu-cionario y del marco filosófico de separación de poderes en el cual se confeccionó su esquema de gobierno. Tampoco puede negarse que el estudio de la Declaración de los De-rechos del Hombre requiere conocer la obra de Rousseau y demás textos que inspiraron aquel grito de “¡Libertad, igualdad, fraternidad!” que resonó en el mundo occidental. Nuestra Constitución también tiene su historia, si bien más íntima, más nuestra.
Con relación a la Sección 7 del Artículo V, esa historia se remonta a la Ley Jones, que asignó la administración de la Rama Judicial al Procurador General, es decir, a un fun-cionario de la Rama Ejecutiva que también era el abogado *645 del Estado en los casos presentados ante el Tribunal.(18) Relata Trías Monge que “[s]obre la necesidad de relevar al Procurador General de la función de administrar la justi-cia había virtual unanimidad de criterio en la Convención Constituyente”.(19) La asignación al Juez Presidente de la dirección de la administración de los tribunales fue, pues, un acto afirmativo de separación de poderes y un factor importantísimo en el esquema de independencia judicial.(20) No pueden tratarse livianamente ni borrarse de un plumazo los deslindes de poderes tan cuidadosamente plasmados en la Constitución.(21)
*646 II
Las reglas adoptadas también encierran un conflicto de separación de poderes, pues expresamente ceden las potes-tades investigativas de la Rama Judicial ante las otras dos ramas gubernamentales.(22) Ambas resoluciones declaran que las investigaciones especiales de la Rama Judicial no podrán intervenir de forma alguna con las que lleven a cabo las otras dos ramas de Gobierno ni con los testigos que se utilicen en éstas.(23) Asimismo, crean una Comisión Especial Independiente del Tribunal Supremo a la cual instruyen que coopere con cualquier investigación que rea-lice el Poder Ejecutivo o el Poder Legislativo.(24) De ese modo, convierten a la Comisión y, de paso, a la OAT como entidad obligada a darle apoyo a ésta.(25) en brazos inves-tigativos de las ramas políticas del País. Incluso, limitan la facultad de la OAT de realizar investigaciones propias que complementen o corroboren los hallazgos de las demás ramas. Así, se lacera la independencia judicial y nos trae recuerdos preocupantes de aquellas épocas en que eran las otras ramas, a través del Procurador General y del poder de asignación de fondos, quienes administraban la Rama Judicial. Nada impide que más de una rama lleve a cabo cierta investigación a la vez, pero si se entiende que existe un choque irremediable, el ordenamiento constitucional da *647 primacía a la Rama Judicial para investigar sus asuntos administrativos internos. Eso es parte de la independencia de la Rama Judicial.
La separación de poderes sirve para mantener el equili-brio entre las tres ramas de Gobierno con el fin de evitar que se ponga en peligro el sistema democrático, concen-trando demasiadas facultades en una de éstas. (26) El pro-pósito de esta organización es asegurar que ninguna de las ramas de gobierno pueda convertirse en opresor de los ciu-dadanos, distribuyendo las tareas y prerrogativas entre tres cuerpos interdependientes que se complementan y se vigilan, manteniendo así un balance dinámico que asegura el funcionamiento eficiente de los tres.(27) De esa forma, se mantiene un sistema de “pesos y contrapesos” que evita que una rama amplíe su poder indebidamente, debilitando a las demás.(28) El desequilibrio se produce tanto cuando una rama le arrebata facultades a otra como cuando una de ellas cede sus poderes a otra. Cuando eso sucede, se rompe el balance y es difícil volver a estabilizarlo. El poder de la Rama Judicial de investigar lo que sucede a su interior no puede estar sujeto a la voluntad de las Ramas Le-gislativa o Ejecutiva.
III
Una mayoría de este Tribunal ejerce de forma simultá-nea, según premisas erróneas, el poder de adoptar reglas y de adjudicar. Atiende el otorgamiento del contrato relacio-nado con la investigación iniciada por la OAT como si se tratase de una controversia judicial bona fide y concluye que es inválido, sin prueba de violación a un reglamento *648 existente al momento de la contratación y sin una vista previa. Para ello, toma conocimiento de hechos de dudosa certeza o difícil corroboración inmediata.(29) Como conse-cuencia, ordena a la Directora de la O AT que deje sin efecto el contrato so pena de desacato. Este proceder ejem-plifica, tristemente, la dicotomía "juez y parte” en su peor manifestación.
El propósito de reglamentar es pautar normas que dic-ten cómo se ejecutará una ley o una política pública, mien-tras que el de adjudicar es resolver una controversia jurí-dica sometida en sus méritos ante un tribunal con competencia y jurisdicción sobre las partes y la materia. Para castigar por desacato se requiere tener jurisdicción sobre la persona y que ésta haya incurrido en un agravio a la autoridad judicial. La existencia de un deber previo está implícita en la propia palabra, pues no puede desacatarse una norma u orden inexistente o desconocida por la parte. En cuanto al desacato por faltar a la dignidad del Tribunal, éste requiere, como mínimo, algún grado de intención, y ambos requieren oportunidad de ser oído.
El desacato en Puerto Rico se divide en dos vertientes, la directa y la constructiva, las cuales pueden surgir en el contexto civil o el criminal, dependiendo de la naturaleza de la afrenta a la autoridad judicial.(30) Pero en ambas si-tuaciones aplica a una persona natural o jurídica que es *649 parte en un proceso judicial ante la consideración de un tribunal. Aquí no existe un proceso judicial, sino un ejerci-cio de reglamentación. Por tratarse de un proceso de regla-mentación, ninguna de las modalidades del desacato aplica a la situación que atienden las resoluciones refrendadas por una mayoría de este Tribunal.
El tratadista Santos Amadeo explica que el desacato constructivo por desobedecer las órdenes de un tribunal ocurre cuando una persona incumple con una directriz con-templada en una “orden legal de un Tribunal relacionadla] con algún pleito o procedimiento que está o ha estado pen-diente” ante el tribunal.(31) Es evidente que este Tribunal no tiene ante su consideración una controversia jurídica presentada mediante un recurso de revisión o apelación. Tampoco hay partes que hayan sido citadas y que hayan incumplido esa orden, que se encuentren esgrimiendo ar-gumentos de derecho ni reclamando remedios legales. Más bien, se ha creado un proceso híbrido reglamentario-adjudicativo para asegurar que la Directora de la OAT deje sin efecto un contrato que la mayoría del Pleno no acepta.(32)
El poder de este Foro para reglamentar la administra-ción de los tribunales no es equivalente al de administrar *650 la Rama Judicial. Por lo tanto, las medidas que adopte este Tribunal no pueden estar dirigidas a obstaculizar o limitar el poder delegado constitucionalmente al Juez Presidente como único responsable de la administración de los tribunales. La OAT, como organismo de apoyo en la admi-nistración del sistema judicial, tiene el deber de promover el uso eficiente de los fondos públicos en beneficio del Pueblo para lograr una administración pública de excelencia.(33) Nuestra Constitución, la ley y el Juez Presi-dente encomiendan expresamente a la OAT que fiscalice el estado de los tribunales de Puerto Rico.(34) Concluir lo con-trario, como hace una mayoría de este Tribunal, equivale a *651 razonar que la labor de administrar la Rama Judicial debe ser ejercida únicamente de forma colegiada.
En apoyo de esta visión, la mayoría hace una relación de la aprobación de varios reglamentos por el Pleno del Tribunal. Intima que si se adopta nuestra interpretación de la Sección 7 estaríamos anunciando de facto que las anteriores instancias de reglamentación fueron fútiles, “ya que el Juez Presidente ostentaría el poder absoluto de ad- . ministrar la Rama en su carácter individual”. (35) Este plan-teamiento revela, nuevamente, que la mayoría confunde la potestad del Pleno de adoptar reglas con una supuesta au-toridad del Pleno de privar al Juez Presidente de la facul-tad de administrar la Rama Judicial.
La mayoría intenta equiparar las recién aprobadas “Re-glas” a los actos de reglamentación anteriores. Sin embargo, estos reglamentos, relacionados con la administra-ción del trabajo judicial y con diversas situaciones que afectaban al personal de la Rama Judicial, no son de la misma naturaleza que las recién aprobadas “Reglas”. Ade-más, todos se aprobaron luego de estudios profundos y los relativos al personal de la Rama tras la recomendación de la Directora Administrativa de la OAT.(36) Las “Reglas” re- *652 cientemente aprobadas no son producto de un proceso de estudio y evaluación, y su alcance no es claro; carecen de una estructura lo suficientemente racionalizada para evi-tar arbitrariedades, ambigüedades y lagunas sustantivas o procesales, y van dirigidas específica e inexorablemente a minar el poder constitucional del Juez Presidente de ejercer su función como administrador de la Rama Judicial. En fin, nada en nuestro voto disidente indica, como aduce la mayoría, que nuestro poder de reglamentar la administra-ción de la Rama Judicial no se haya ejercido antes. Lo único novedoso en esta instancia es el proceder de la ma-yoría al ejercer un poder constitucional de forma contraria a nuestra Constitución.
Más allá de la inconstitucionalidad de las resoluciones certificadas, tenemos serias dudas en cuanto a la validez y la utilidad de las reglas adoptadas para los procedimientos de investigaciones especiales independientes de la Rama Judicial. Éstas no tan solo son vagas en cuanto a su al-cance, sino que contravienen el principio de pureza en las investigaciones que supuestamente motiva la regla-mentación.
El alcance de las Reglas es incongruente. Por un lado, las Reglas 4 y 6 sugieren que las normas adoptadas aplican a las investigaciones cuyo objeto sean los Jueces y las Jue-zas del Tribunal Supremo o a su personal. No obstante, las Reglas 2 y 3 establecen que las Reglas aplicarán a todos los procedimientos investigativos dirigidos a cualquier funcio-nario de la Rama Judicial. Asimismo, la Regla 5 señala que se referirá a una Comisión Especial cualquier asunto cuya investigación se autorice, pero la Regla 6(a) indica que las comisiones se crearán cuando las investigaciones incluyan a los Jueces y las Juezas que componen el Tribunal Supremo o a su personal.
Notamos, además, que debido a lo apurado que fue el *653 proceso de adoptar y aprobar esta reglamentación, las Re-glas son propensas a dejar un sinnúmero de asuntos al descubierto, tanto a nivel procesal como sustantivo.(37) Realmente, más allá de su título, fundamento jurídico y alcance, las Reglas atienden pocos asuntos. Solamente dis-ponen sobre ciertos requisitos de forma para solicitar al Tribunal que apruebe una solicitud de investigación,(38) la investigación de asuntos relacionados con los Jueces y las Juezas del Tribunal Supremo y su personal, y los aspectos operacionales de la Comisión Especial Independiente. La Regla 7 deja a la discreción de este Tribunal determinar el trámite a seguir en cualquier situación no contemplada en la Resolución.(39) Evidentemente, serán muchos los aspec-tos no previstos.
Esta estructura reglamentaria es hueca. En lugar de llenar un vacío, estas reglas establecen un esquema de in-vestigaciones improvisadas que pueden tornarse arbitra-rias fácilmente,(40) pues se implanta un procedimiento de investigación centrado en decisiones ad hoc. Esto no propi-cia la indagación eficiente y justa en los procedimientos de investigación realizados con fondos de la Rama Judicial y es particularmente preocupante frente al derecho al debido *654 proceso de ley que tiene cualquier persona objeto de una pesquisa al amparo de estas reglas.
IV
Estas resoluciones surgen como reacción a una situa-ción particular en lugar de responder a un análisis ponde-rado sobre la necesidad de reglamentar alguna fase de la administración de los tribunales, el alcance de ese ejercicio y la mejor manera de llevarlo a cabo. Las resoluciones que motivan estas páginas quebrantan nuestro esquema cons-titucional al restarle poderes tanto al Juez Presidente como a la Rama Judicial; violan el derecho a un debido proceso de ley de la Directora Administrativa de la OAT y establecen unas reglas ambiguas que no cumplen con lo que se proponen. La acción que ha tomado una mayoría del Tribunal representa un precedente peligroso para la admi-nistración de una de las tres ramas de gobierno del País y afecta el balance de poderes fundamental en nuestro es-quema de gobierno. Por todo ello, disiento.

 La mal llamada infalibilidad de los máximos foros constitucionales de un país ha sido objeto de análisis y crítica por la comunidad legal a través del tiempo. H.L.A. Hart, The Concept of Law, Londres, Oxford University Press, 1975, pág. 138. Como manifestó el Juez Robert Jackson, “no somos finales porque somos infalibles, *636 somos infalibles únicamente porque somos finales”. (Traducción nuestra.) Brown v. Allen, 344 U.S. 443, 540 (1953), opinión concurrente del juez asociado Jackson. Pero el problema de la infalibilidad judicial es más peligroso cuando, en vez de simple-mente equivocarse en una adjudicación constitucional, es el propio Tribunal Supremo el que ha violado, como actor, los límites de la Constitución. J. Wade Nowlin, Constitutional Violations by the United, States Supreme Court: Analytical Foundations, 2005 (Núm. 5) U. Ill. L. Rev. 1123 (2005).

 In re Aprobación Rs. Proc. Esp. RJ, 184 D.P.R. 500 (2012).

 Art. V, Sec. 7, Const. E.L.A., L.P.R.A., Tomo 1, ed. 2008, pág. 416.

 El Voto de Conformidad afirma que yo celebro una “dictadura imperial sin aparentes límites en su facultad administrativa”. (Énfasis y subrayado en el original.) Voto de conformidad, pág. 576. Dicha aseveración representa un intento descontextualizado de parafrasear al Juez Antonin Scalia en su disidencia en Planned Parenthood of Southeastern Pa. v. Casey, 505 U.S. 833, 996 (1992), en la cual, curiosamente, éste critica a la mayoría del Tribunal Supremo federal por trascender los límites de su poder constitucional. Lo que expresa el Voto de Conformidad es totalmente desacertado. No soy yo quien celebra la concentración de poder; son las resoluciones aprobadas por la mayoría las que establecen un poder judicial irres-tricto al asignarle al Pleno el poder que fue dividido constitucionalmente.

 En ese sentido, la mayoría parece recurrir a las herramientas de hermenéu-tica que se utilizan típicamente para la interpretación estatutaria. Tal proceder, además de incorrecto, es peligroso. Una Constitución no se interpreta como si fuera un estatuto. K. Stack, The Divergence of Constitutional and Statutory Interpretation, 75 U. Colo. L. Rev. 1 (2004); A. Kavanagh, Original Intention, Enacted Text and Constitutional Interpretation, 47 Am. J. Juris. 255, 290 (2002).

 El Voto de Conformidad, al comentar mi señalamiento sobre este asunto, comete el mismo error en que incurrió al analizar la Constitución: olvida el contexto y analiza mis expresiones superficialmente para aferrarse a la norma de interpreta-ción estatutaria que supone que los términos se usan siempre con el mismo signifi-cado en un mismo texto legislativo. Como explica Clark, la herramienta de la lectura “intratextualista”, en la que se emplea una hermenéutica sistemática de los términos utilizados en diferentes partes de un estatuto, no debe usarse mecánicamente en la interpretación constitucional. B. Clark, Federal Lawmaking and the Role of Structure in Constitutional Interpretation, 96 (Núm. 3) Calif. L. Rev. 699, 723 (2008). A1 referirme a la necesidad de ir más allá del texto, no planteo, como afirma el Voto de Conformidad, que existan dos “administraciones” en la Constitución, sino que, den-tro del esquema amplio de separación de poderes de la Constitución, es improcedente una lectura minimalista y simplista que tajantemente otorga todo el poder sustan-tivo al Tribunal y limita al Juez Presidente meramente a una herramienta de trámite. Véase Voto de conformidad, pág. 584 esc. 7 y págs. 588-589.

 A. Scalia, Common-Law Courts in a Civil-Law System: The Role of United States Federal Courts in Interpreting the Constitution and Laws, The Tanner Lectures on Human Values, Princeton University, 8 y 9 de marzo de Í995. En particular, como explica el profesor Eskridge, no se puede perder de perspectiva que un “esta-tuto ordinario y la Constitución extraordinaria son instrumentos legales estructural-mente distintos”. W. Eskridge, Jr., Textualism and Original Understanding: Should the Supreme Court Read the Federalist but not Statutoiy Legislative History, 66 (Núms. 5-6) Geo. Wash. L. Rev. 1301, 1316 (1998).

 (Énfasis suplido.) 3 Diario de Sesiones de la Convención Constituyente 1666 (ed. conmemorativa 2003).

 íd.

 Según Charles Black, el derecho constitucional surge de las instituciones creadas o reconocidas por la Constitución, en vez de directamente de su texto. Clark, supra, pág. 727. Por su parte, el Juez Stephen Breyer enfatiza que, en la interpre-tación constitucional, se debe prestar mayor atención a los valores encarnados en el texto y al diseño del ordenamiento creado en su totalidad. S. Breyer, Active Liberty: Interpreting Our Democratic Constitution, Nueva York, Vintage Books, 2005, pág. 8. En particular, el autor señala la “complejidad estructural” de la Constitución y las salvaguardas que ella misma crea dentro de dicha estructura. íd., págs. 28-31. Fi-nalmente, como explica el profesor Tribe, en el plan constitucional, “hay más de los que se aprecia a simple vista”. (Traducción nuestra.) L. Tribe, The Invisible Constitution, London, Oxford University Press, 2008, pág. 8 (“there’s more there than meets the eye” (énfasis nuestro)).

 Esto contrasta grandemente con la afirmación constante de las Reglas adop-tadas de que ninguna investigación nuestra podrá llevarse a cabo si la Asamblea Legislativa ya ha iniciado otra. Como puede apreciarse, la Convención Constituyente quería evitar ese escenario, disponiendo que el poder protegido por la Sección 7 sería la Rama Judicial, de manera que ésta no esté a la merced de los demás poderes en cuanto a la administración interna de sus recursos.

 (Énfasis suplido.) Diario de Sesiones, supra, págs. 1667-1668.

 para concluir que el Juez Presidente no tiene poder alguno para pautar normas sobre el funcionamiento de la Rama Judicial, el Voto de Conformidad cita parte del debate en la Convención Constituyente. Voto de conformidad, págs. 585-586. La realidad es que una lectura integral del debate sobre la Sección 7 del Artículo V demuestra que los poderes del Pleno del Tribunal Supremo para reglamentar la administración de los tribunales no fueron otorgados a expensas de los del Juez Presidente. El debate citado por el Voto de Conformidad se refería específicamente a si se debía exigir que la facultad del Juez Presidente de nombrar y destituir al Director Administrativo estuviese sujeta a reglamentación. Por entender que ello limitaba los poderes del Juez Presidente, la Convención derrotó la enmienda. Re-sulta, pues, que el debate citado se centró en proteger los poderes del Juez Presidente. El Voto de Conformidad invierte dicho objetivo y utiliza el debate, fuera de contexto, para reforzar su conclusión equivocada.

 J. Trías Monge, Historia Constitucional de Puerto Rico, San Juan, Ed. U.P.R., 1982, Vol. III, pág. 98.

 gj y0t0 ¿e Conformidad insiste en que la única división que hizo la Consti-tución fue delegar al Tribunal Supremo el poder de establecer las reglas de adminis-tración y al Juez Presidente la facultad de ponerlas en vigor. Voto de conformidad, págs. 581-582. Procede entonces a caracterizar como “refrescante” mi reconocimiento de que tanto el Pleno del Tribunal Supremo como el Juez Presidente tienen “el poder para velar por el buen uso de los recursos de la Rama Judicial ...” íd., pág. 598. Sin embargo, hasta ahí llega la aparente coincidencia entre ambos votos, pues la confor-midad ni siquiera reconoce el poder del Juez Presidente de llevar a cabo una inves-tigación o auditoría para conocer cómo se están utilizando los fondos de la Rama.

 Negrón Soto v. Gobernador, 110 D.P.R. 664 (1981).

 íd., pág. 667.

 El Artículo 14 de la Carta Orgánica de 2 de marzo de 1917, mejor conocida como Ley Jones, dispone que “[e]l Procurador General tendrá a su cargo la adminis-tración de justicia en Puerto Rico; será el consejero legal del Gobernador y de los jefes de departamentos, y será responsable de la debida representación del Pueblo de Puerto Rico o de sus funcionarios debidamente constituidos, en todas las demandas y procesos, civiles o criminales, ante el Tribunal Supremo de Puerto Rico .... También desempeñará aquellos otros deberes, no incompatibles con esta Ley, que se le asig-naren por ley”. Acta Jones, 39 Stat. 951, Documentos Históricos, See. 2, L.P.R.A., Tomo 1, ed. 2008, págs. 88-89.

 ffriag Monge, op. cit, pág. 98.

 El modelo inmediato para el esquema adoptado fue el de la Constitución de Nueva Jersey. J. Trías Monge, El Sistema Judicial de Puerto Rico, San Juan, Ed. U.P.R., 1978, pág. 124. Curiosamente, al referirse al modelo de Nueva Jersey, el Voto de Conformidad cita con autoridad unas expresiones del Tribunal Supremo de ese estado que no confirman la tesis de la mayoría, sino las conclusiones de los votos disidentes. El Voto de Conformidad interpreta el siguiente enunciado del Tribunal Supremo de Nueva Jersey: “ ‘[t]hose two provisions give the Chief Justice and the Supreme Court sweeping authority to govern their own house.’ ” (Enfasis en el original.) Voto de conformidad, pág. 589. De esta cita surge con claridad que el Tribunal Supremo de Nueva Jersey reconoce que tanto el Juez Presidente como el Tribunal Supremo tienen autoridad para “gobernar” la Judicatura. Nada en esta cita apoya la conclusión del Voto de Conformidad de que el Tribunal Supremo de Nueva Jersey “no titubea” al afirmar que el poder del Pleno es establecer la política de la Rama Judicial y el del Juez Presidente es ejecutarla. Más aún, en esa misma Opi-nión del Tribunal Supremo de Nueva Jersey encontramos que el poder de reglamen-tar la administración de los tribunales es compartido por el Pleno del Tribunal y el Juez Presidente: “Because their rulemaking authority cannot be circumscribed by legislation, the Supreme Court and the Chief Justice exercise exclusive and plenary power over the governance of the judiciary.” (Enfasis suplido.) In re P.L. 2001, Chapter 362, 186 NJ 368, 381-382, 895 A.2d 1128 (2006). Desafortunadamente, el Voto de Conformidad no cita esta parte de la Opinión.

 Al analizar el Informe de la Comisión de la Rama Judicial sobre el traslado de la administración de los tribunales de la Rama Ejecutiva a la Judicial, el Voto de Conformidad concluye: “No cabe duda de la magnitud del poder que la Convención Constituyente delegó al Tribunal Supremo en cuanto a la administración de los tribunales en Puerto Rico”. (Enfasis en el original.) Voto de conformidad, pág. 584. *646 De esa forma, la mayoría trata de obviar todo el debate acerca de la segunda división del poder, esta vez al interior de la Rama Judicial; cuando advierte que existe, in-tenta minimizarlo.

 Art. I, Sec. 2, Const. E.L.A., L.P.R.A., Tomo 1. Véase, además, Artículo 2.002 de la Ley de la Judicatura del Estado Libre Asociado de Puerto Rico de 2003, que dispone que el poder de reglamentación del Tribunal estará “enmarcado en el prin-cipio de autonomía judicial”. (Enfasis nuestro). 4 L.P.R.A. sec. 24c.

 Regla 3 para los Procedimientos de Investigaciones Especiales Independien-tes de la Rama Judicial, In re Aprobación Rs. Proc. Esp. RJ, supra, págs. 502-503; In re Miembros Com. Esp. Independiente, 184 D.P.R. 507, 508 (2012).

 Regla 6(h) para los Procedimientos de Investigaciones Especiales Indepen-dientes de la Rama Judicial, In re Aprobación Rs. Proc. Esp. RJ, supra, pág. 505.

 Regla 6(g) para los Procedimientos de Investigaciones Especiales Indepen-dientes de la Rama Judicial, In re Aprobación Rs. Proc. Esp. RJ, supra, pág. 504-505.

 Véase Negrón Soto v. Gobernador, supra, pág. 666.

 Véase J.J. Álvarez González, Derecho constitucional de Puerto Rico y relaciones constitucionales con los Estados Unidos, Bogotá, Ed. Temis, 2009, págs. 235-237 y 265.

 Véase Nogueras v. Hernández Colón, 127 D.P.R. 405, 426 (1990).

 De hecho, el Tribunal siquiera tuvo ante sí —ni cita de forma expresa— el contrato en cuestión, pues la descripción de éste que se incluye en las resoluciones se basa en la información que ha difundido la prensa del País.

 El desacato directo consiste en “algo hecho o dejado de hacer, en presencia de la Corte, encaminado a impedir o interrumpir sus procedimientos o poner en duda su integridad”. S.P. Amadeo, El poder de los tribunales en Puerto Rico para castigar por desacato, Madrid, Ed. Rev. Der. Privado, 1961, pág. 7. A su vez, “[u]n desacato indirecto o constructivo es un acto realizado, no en la presencia de la Corte o de un juez mientras actúa judicialmente, bajo circunstancias que razonablemente tiendan a degradar la Corte o al juez como un funcionario judicial, o a obstruir, interrumpir o impedir la administración de justicia por la Corte o juez”. Id., pág. 8. Véanse: In re Velázquez Hernández, 162 D.P.R. 316 (2004); D.A.Co. v. Alturas FI. Dev. Corp. y otro, 132 D.P.R. 905 (1993); Srio. D.A.C.O. v. Comunidad San José, Inc., 130 D.P.R. 782 (1992); Pueblo v. Lamberty González, 112 D.P.R. 79 (1982); Pueblo v. Torres, 56 D.P.R. 605, 611 (1940).

 Amadeo, op. cit., pág. 71.

 Las resoluciones se fundamentan en que la OAT no tiene facultad para investigar “la conducta de los Jueces y las Juezas del Tribunal Supremo”. In re Aprobación Rs. Proc. Esp. RJ, supra, pág. 501. Sin embargo, como refleja la infor-mación citada en otra parte de la misma Resolución, la investigación iniciada por la Directora de la OAT no está dirigida a disciplinar a un Juez o una Jueza del Tribunal Supremo. Por ello, la razón principal para desautorizar la investigación de la OAT se desploma. Por eso también, contrario a lo que señala el Voto de Conformidad de mis compañeros Jueces y compañera Jueza que avalaron las resoluciones de epí-grafe, no se puede decir que la OAT actuó sin autoridad. Lo que sí hay que advertir es que, si el Reglamento aprobado en la Resolución ER-2012-1 tiene como fin encau-zar procedimientos para disciplinar a los Jueces y las Juezas, ese Reglamento es ultra vires, pues al igual que la OAT, el Tribunal Supremo no tiene autoridad cons-titucional para disciplinar a sus integrantes. Respecto a esto tengo que puntualizar que se equivocan los Jueces Asociados y la Jueza Asociada de mayoría cuando indi-can que en este voto disidente se reconoce que la investigación iniciada por la OAT es ultra vires, pues realmente concluyo todo lo contrario. Véase Voto de conformidad, págs. 578 y 598.

 Véase Restructuración de la Oficina de Administración de los Tribunales: razones, estructura y funciones, Memorando Núm. 1 de la Oficina de Administración de los Tribunales, año fiscal 1998-1999,1 de julio de 1998. Este documento realza la estructura rediseñada y las nuevas funciones de la OAT. En sus criterios principales para la restructuración incluye “[rleconceptualizar la auditoría como un socio que colabora para que la organización utilice sus fondos con los controles adecuados, y con las mayores probabilidades de lograr efectividad en sus operaciones. Para esto se expanden las funciones de auditoría para incluir la auditoría operacional”. (Enfasis nuestro.) Id., pág. 1.2. Como misión accesoria a la de asesorar al Juez Presidente, la OAT tiene entre sus funciones principales “[p]reparar la documentación necesaria para rendir cuentas por el uso de los fondos públicos, incluso: planes de trabajo, peticiones presupuestarias e informes de progreso a la Rama Judicial”. Id., pág. 2.4.

 La Orden Administrativa OA-JP-2009-108, sobre las Funciones de la Ofi-cina de Administración de los Tribunales, establece, conforme al Artículo 2.016 de la Ley de la Judicatura del Estado Libre Asociado de Puerto Rico de 2003 (4 L.P.R.A. sec. 24n), que “[e]n virtud de las disposiciones constitucionales y legales ... dispone-mos, entre otros, los deberes y las obligaciones que corresponderán a la Oficina de Administración de los Tribunales bajo la dirección del(de la) Director(a) Administra-tivo(a) de los Tribunales:
“1) Evaluar continuamente los métodos administrativos y la eficiencia del personal del Tribunal General de Justicia y hacer recomendaciones al(a la) Juez(a) Presidente(a) para mejorar el funcionamiento de los tribunales y las demás depen-dencias de la Rama Judicial.
“7) Recopilar estadísticas y cualquier otra información sobre el funcionamiento de los tribunales.
“11) Hacer recomendaciones al(a la) Juez(a) Presidente(a), según los criterios y las normas que a esos fines establezca, sobre ... administrar las regiones judiciales o el Tribunal de Apelaciones y tomar las medidas que el(la) Juez(a) Presidente(a) or-dene para lograr la mejor utilización de los recursos judiciales.
“15) Desempeñar cualquier otra encomienda que [el(la) Juez(a) Presidente(a)] le delegue para la consecución de una administración óptima de la justicia.” OA-JP-2009-108, págs. 2-4.

 Voto de conformidad, pág. 591.

 En In re Reglas Adm. T.P.I., 148 D.P.R. 883 (1999), nuestro poder de regla-mentación fue ejercido para derogar unas reglas aprobadas en 1975, con el fin de actualizar la administración del foro primario. Se aprobó un cuerpo de reglas abar-cador que fue complementado por la labor de varios Comités de Revisión de Reglas del Tribunal de Primera Instancia y discutido ampliamente durante la Conferencia Judicial de 28 de abril de 1998. Id., págs. 883-884. Igualmente, en Regl. Creac. y Func. Unidad Esp. J. Apel., 134 D.P.R. 670 (1993), se aprobó una reglamentación dirigida a estructurar el manejo interno del trabajo judicial. En In re Enmda. Art. 19.1 Regl. A.S.P.R.J., 158 D.P.R. 191 (2002), la Directora Administrativa de la OAT recomendó una enmienda a las reglas sobre el personal de la Rama, con el fin de “atemperar el lenguaje a la neutralidad del género” y aclarar otras disposiciones sobre las licencias de vacaciones. Id., pág. 191. Aprobamos dicha recomendación. En In re Enmda. Regl. Adm. Pers. R.J. I, 162 D.P.R. 425 (2004), nuevamente enmenda-mos un reglamento con el fin de proveer un incentivo adicional que reconociera la labor sobresaliente de los empleados y empleadas, eliminando una descalificación de beneficios a quienes hubiesen recibido un aumento por mérito. Id., pág. 425. En In re Enmda. Regl. Adm. Pers. R.J., 167 D.P.R. 822 (2006), se enmendaron dos artículos de dicho reglamento, otra vez por recomendación de la Directora Administrativa de la *652 OAT, con el fin de aclarar el lenguaje en las disposiciones concernientes al proceso de cesantía y la jornada de trabajo.

 Por ejemplo, se obvió algo tan básico como informar a todos los Jueces Asociados y todas las Juezas Asociadas sobre quiénes son las personas designadas a la Comisión y sus cualificaciones para desempeñar las funciones asignadas.

 por ejemplo, que sea juramentada la solicitud, si no proviene del Juez Pre-sidente, de algún Juez Asociado o de alguna Jueza Asociada del Tribunal Supremo. Regla 4(c) para los Procedimientos de Investigaciones Especiales Independientes de la Rama Judicial, In re Aprobación R. Proc. Esp. RJ, supra, pág. 503.

 “El Tribunal Supremo determinará el trámite a seguir en los asuntos no previstos por estas Reglas, en la forma que garantice el cumplimiento de los propó-sitos de transparencia y sana administración pública que inspiran estos procedimientos.” Regla 7 para los Procedimientos de Investigaciones Especiales In-dependientes de la Rama Judicial, In re Aprobación R. Proc. Esp. RJ, supra, pág. 505.

 Por ejemplo, a la Comisión nombrada en esta ocasión para investigar la investigación encomendada por la OAT no se le brindan más parámetros que “inves-tigar el uso de fondos y recursos públicos de la Rama Judicial”, no interferir con las investigaciones de las Ramas Legislativa y Ejecutiva, y respetar los “principios” del debido proceso de ley, la imparcialidad y la objetividad.